1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

STEVEN JOSEPH NOBLE, IV,

        Plaintiff,

   v.

D. ADAMS, et. al.,

        Defendants.

_____/

CV F   03  5407  AWI SMS P

FINDINGS AND RECOMMENDATIONS
REGARDING MOTION FOR SUMMARY
JUDGMENT (Doc. 82)

**A.  RELEVANT PROCEDURAL HISTORY**

     Steven Joseph Noble  ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff filed an Amended Complaint on May 12, 2003, on which this case is proceeding.  Plaintiff alleges that Defendants Cuevas and Adams violated his Eighth Amendment rights by limiting Plaintiff's access to outdoor exercise from January 9, 2002, to April 2003, and denying him access to the courts.  The Amended Complaint also alleges that Defendants Adams, Espinoza and Pugliese violated his First Amendment rights by interfering with Plaintiff's right to receive mail.

     On December 3, 2004, Defendants moved to dismiss the action on the grounds that

1   Plaintiff failed to exhaust his administrative remedies.[1]  The Court issued Findings and

2   Recommendations that the Motion be denied on August 19, 2005.  The District Court adopted

3   the Findings and Recommendations on September 21, 2005.  On December 7, 2006, the

4   Defendants filed a Motion for Summary Judgment.  Plaintiff filed his Opposition to the Motion

5   on February 27, 2007.

6   **B.  SUMMARY JUDGMENT STANDARD**

7          Summary judgment is appropriate when it is demonstrated that there exists no genuine

8   issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

9   Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

10                 always bears the initial responsibility of informing the district court
                   of the basis for its motion, and identifying those portions of "the
11                 pleadings, depositions, answers to interrogatories, and admissions
                   on file, together with the affidavits, if any," which it believes
12                 demonstrate the absence of a genuine issue of material fact.

13   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

14   burden of proof at trial on a dispositive issue, a Summary Judgment Motion may properly be

15   made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions

16   on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

17   upon motion, against a party who fails to make a showing sufficient to establish the existence of

18   an element essential to that party's case, and on which that party will bear the burden of proof at

19   trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the

20   nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a

21   circumstance, summary judgment should be granted, "so long as whatever is before the district

22   court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

23   satisfied."  Id. at 323.

24          If the moving party meets its initial responsibility, the burden then shifts to the opposing

25   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

26   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

27

28   _____

          [1]An Amended Motion was submitted on December 21, 2004. (Doc. 38.)

1    In attempting to establish the existence of this factual dispute, the opposing party may not

2    rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the

3    form of affidavits, and/or admissible discovery material, in support of its contention that the

4    dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must

5    demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

6    suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W.

7    Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that

8    the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for

9    the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

10   In the endeavor to establish the existence of a factual dispute, the opposing party need not

11   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

12   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

13   trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

14   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

15   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

16   amendments).

17   In resolving the Motion for Summary Judgment, the Court examines the pleadings,

18   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

19   any.  Rule 56(c).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at

20   255, and all reasonable inferences that may be drawn from the facts placed before the court must

21   be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v.

22   Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam).  Nevertheless, inferences are not drawn out

23   of the air, and it is the opposing party's obligation to produce a factual predicate from which the

24   inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D.

25   Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

26   Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

27   show that there is some metaphysical doubt as to the material facts.  Where the record taken as a

28   whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

3

1   issue for trial.'" Matsushita, 475 U.S. at 587 (*citation omitted*).

2   **C. UNDISPUTED FACTS**[2]

3       1.   On September 1, 2000, Plaintiff, Steve Joseph Noble, was sentenced to state
4            prison for the crime of grand theft of property from a person.

5       2.   At the times relevant to the Complaint, Plaintiff was confined at the California
6            Substance Abuse Treatment Facility ("SATF"), at Corcoran, California.

7       3.   Plaintiff has been identified by prison officials as an ex-member of the 78th Street
8            Crips, which is a street gang, considered to be a disruptive group within the state
9            prisons.

10      4.   Plaintiff filed an appeal from his criminal conviction on October 3, 2003.  The
11           appeal was denied on June 7, 2001, and Plaintiff then filed a Petition for Review
12           in the California Supreme Court on July 13, 2001.  Plaintiff's Petition for Review
13           was denied on August 8, 2001.  Plaintiff filed a Petition for Writ of Certiorari in
14           the U.S. Supreme Court which was denied on February 26, 2002.

15      5.   Plaintiff filed Petitions for Writs of Habeas Corpus in the California Appellate
16           Court on November 21, 2002, and April 7, 2003.  Both petitions were summarily
17           denied.

18      6.   Plaintiff filed a Petition for Writ of Habeas Corpus in the California Supreme
19           Court on June 3, 2003.  The court issued an Order to Show Cause, returnable in
20           the Los Angeles Superior Court on July 14, 2004.

21      7.   Plaintiff filed a Petition for Writ of Habeas Corpus in the Central District of
22           California on April 9, 2004.  This Petition was voluntarily dismissed on June 9,
23           2004.

24      8.   Plaintiff filed a second Petition for Writ of Habeas Corpus on September 10,

---

26   [2]The following facts are undisputed for the purpose of the instant Motion only and do not apply to any
27   subsequently filed Motion. Plaintiff disputes numerous facts presented by the Defendants on the basis that he
     disagrees with the policy, or disagrees based on his own personal opinion, with certain facts.  However, such
     comments do not render the facts disputed. Many of the facts listed are simply statements about what a particular
28   policy states.  Although Plaintiff disagrees with the policy or the handling of a situation on any given day, that in and
     of itself does not render a fact undisputed.

4

1    2004.  On November 30, 2004, the Respondent moved to dismiss the Petition for

2    failure to exhaust the claims in state court.  The Motion to Dismiss was denied on

3    February 25, 2005, and Respondent was ordered to file a return to the Petition.

4    This habeas action is still pending.

9.   The entire population of C-Facility at SATF was placed on lockdown status on

December 31, 2001, because of a riot.  On January 8, 2002, it was determined that

all inmates in C-Facility, with the exception of one disruptive group could be

released to normal program, including yard access.

10.  One day later, on January 9, 2002, a group of African-American inmates on the C-

Facility, yard 1 attempted to murder a correctional officer, and assaulted numerous

other correctional staff.  This incident immediately followed an inmate-on-inmate

assault.

11.  After the initial assault incident was controlled, the inmates on the yard were

recalled back to their respective buildings.  As part of processing the inmates into

their housing units, they were subjected to unclothed body searches.  A number of

inmates who were still on the yard saw that staff were searching all inmates before

allowing them to enter the housing units and apparently decided to discard their

weapons.

12.  As inmates were being searched, an inmate, later identified as Moreno, incited a

number of African-American inmates to assault staff.  Other staff responded to

stop the assault, while other inmates joined in the attack.  Eventually, between 10

and 16 inmates were identified as participants in the attack.  Approximately

twenty-one staff members reported injuries as a result of the inmate assaults, and

nine were taken to outside hospitals for evaluation and treatment.

13.  After the riot was controlled, the Warden declared a state of emergency and the

institution was placed on lockdown status.

14.  A State of Emergency exists when there is a suspension of any non-essential

operation, procedure, service or function and the normal time limits or schedules

5

for activities for the purpose of preventing, containing or controlling a
disturbance.

15.   The suspension of normal operations of a prison is commonly called a
"lockdown" because all or a portion of the inmate population are confined to their
cells.  The approval of the Director of Corrections must be obtained if; the
lockdown of all housing units exceeds 24 hours; the lockdown of less than all of
the housing units exceeds 72 hours; or the suspension of major program activities
such as academic programs, exercise, or visiting, exceeds 72 hours.

16.   During a state of emergency the warden may authorize the postponement of
nonessential administrative decisions such as classification, disciplinary and
appeal proceedings.

17.   A state of emergency is to be under constant review and evaluation.  The goal is to
restore normal operations as quickly as possible.  A state of emergency is
terminated when the warden determines it is safe to do so.

18.   When a disturbance or an incident of violence occurs the first actions taken are
those necessary to end the disturbance and to provide medical treatment to those
who are injured.  Administrative staff, including, but not limited to, the Warden,
the Administrative Officer of the Day, the Captain and the Regional Administrator
are notified.  All necessary paperwork is then completed, this may include
documentation necessary to confine inmates to administrative segregation, as well
as reports of the staff observing or involved in the control of the incident.

19.   After a lockdown is imposed an investigation of the incident(s) is initiated.  The
investigation is for the purpose of determining the cause of the disturbance and to
assist in determining whether it is safe to release inmates from lockdown status.

20.   All inmates in the area in which the lockdown is imposed are interviewed.  All
cells and common areas are searched.  Members of the Inmate Advisory Council
(elected inmate representatives) are interviewed to both develop and substantiate
information.  Central files are reviewed to verify information.  When the

investigation is complete it is the responsibility of the Captain to develop a plan
for releasing inmates from lockdown status.

21.     A lockdown can be released immediately, if it is determined that there is little or
no danger of repeated violence.  These situations commonly involve a small
number of inmates with a personal dispute, such as a debt.

22.     A lockdown can continue for an extended period of time if the information
developed during the investigation indicates that there is a likelihood of continued
violence.  A lengthy lockdown may involve large scale disturbances between rival
prison gangs or different ethnic groups, or large scale disturbances resulting in
violence directed towards staff. If the violence is gang related or racially
motivated the lockdown may be limited to particular ethnic groups.

23.     Every lockdown is to be continuously reevaluated in an effort to return the prison
to normal operations.  Lockdowns are generally released gradually.  Critical
workers, who are part of non-involved groups, are identified for release to their
work assignments, which include food services, laundry and sanitation jobs.  A
schedule for showers is generally implemented within a few days of imposing a
lockdown.

24.     The investigative process and the process of releasing inmates from a lockdown
can include individual and group interviews with all inmates.  It can also include
the release of inmate "representatives" for the purpose of allowing them to speak
with other inmates about the lockdown and any ongoing disputes between various
ethnic groups.  Other efforts may include attempts to mediate any underlying
dispute among the inmate groups.

25.     When a determination has been made that a lockdown can be lifted the unlock is
implemented gradually.  A determination is made of those inmates most likely to
program successfully.  They are released first, in controlled groups making sure
that no ethnic group has numerical superiority.  All inmates released to the
exercise yard are subjected to unclothed body searches and metal detectors are

1    used as well.

2    26.   The number of inmates released from lockdown is gradually increased until all

3          inmates are returned to normal program.  If there is any serious incident during the

4          unlock process the lockdown is re-instituted.

5    27.   The lockdown at SATF was imposed to protect the safety and security of staff, the

6          institution and inmates.  A significant number of staff needed immediate medical

7          attention, including nine that were taken to outside hospitals.

8    28.   The investigation of the attempted murder of the correctional officer was

9          immediately initiated.  It was critical to determine whether this was a planned or

10          spontaneous attack, if it was specifically directed toward the officer assaulted, or

11          if he was a target of opportunity.

12    29.   It was initially determined that the sixteen African-American inmates involved in

13          the assault were affiliated with the "Crips," "415's" and "Bloods," which are street

14          gangs identified by the Department of Corrections and Rehabilitation as disruptive

15          groups.  The mass assault on staff at SATF was an unprecedented event. It was

16          also unusual because of the combination of normally rival disruptive groups

17          acting together.

18    30.   All of the efforts described above were undertaken to move toward a full release

19          of the lockdown.  On January 16, 2002, non-contact visiting was reinstated.  This

20          allowed inmates to be out of their cells for visits.  All movement was done in

21          restraints and by escort only. It was still unknown when the lockdown could be

22          released.

23    31.   On February 13, 2002, inmates were allowed access to the canteen, with a

24          spending limit of $45.

25    32.   On April 11, 2002, normal visiting was restored for African-American and white

26          inmates, however, the Northern Hispanics inmates were kept on non-contact

27          visiting status.  The Northern Hispanic inmates were on modified program due to

28          an incident that occurred in December 2001.

33.  The investigation of the incident continued until it was determined that the assault on staff was not a pre-planned attack. A number of African-American inmates had armed themselves on January 9, 2002, because they anticipated an assault by Hispanic inmates. The assault by one white inmate on another apparently prevented this anticipated assault. When the African-American inmates observed that all inmates were being subjected to unclothed body searches, before they were allowed to enter their housing units, some of them discarded their weapons.

34.  Inmate Moreno, who incited the other African-American inmates to attack staff had a grudge against a particular officer, but his gang had not sanctioned an attack on the officer. As he was waiting to be given an unclothed body search, he seized the opportunity to assault the targeted officer. The other inmates who joined in the attack on staff, were incited to participate by inmate Moreno. Four stabbing weapons were found within the area of the attack. Three other weapons were found nearby.

35.  After it was determined that the assault on staff was not pre-planned, additional steps could be taken to gradually restore normal programing.

36.  On June 27, 2002, a meeting was held between Captain Cuevas, his staff, and selected inmates representing the African-American inmate population in C-Facility. The purpose of the meeting was to notify the inmates about the proposals for modifying the lockdown in C-Facility. A decision was made to open the day-room for African-American inmates who were not affiliated with a gang or disruptive group, on July 8, 2002.

37.  The goal of this modification was to observe the controlled release of inmates, and if the program ran without further acts of violence, the day-room would then be opened for the remaining African-American population. If the day-room program proved disruptive, the releases would be stopped and evaluated before another attempt was made to start releasing inmates from the lockdown.

38.  On July 19, 2002, all African-American inmates were allowed access to the day-

room on a rotational basis.

39. On August 1, 2002, an administrative decision was made to open the exercise yard to all inmates for a modified program, this plan was to release one building at a time, on a rotational basis.  This plan was implemented on August 4, 2002.

40. On August 8, 2002, the plan was modified to exclude Southern Hispanic, Fresno Bulldogs, and Northern Hispanic inmates (inmates considered to be affiliated with disruptive groups).  The releases were then limited to one tier of one building at a time, on a rotational basis.

41. On November 15, 2002, C-Facility was again locked down because of a battery on an inmate with a weapon, on November 14,2002.  There had also been several other incidents of weapons possession.

42. The modified outdoor exercise schedule was resumed on November 27, 2002.  Hispanic and white inmates continued to be locked down.  White inmates were released from lockdown on December 3, 2002.

43. African-American inmates were returned to lockdown status because of a battery on a peace officer on February 13, 2003.  It was necessary to evaluate this incident to determine if it was an isolated incident of opportunity, or was a planned, organized assault.

44. All of C-Facility was placed on lockdown status on March 21, 2003, to search the entire facility for weapons. Numerous weapons had been found on two prior, separate occasions.  The searches were completed, and the continuation of the lockdown was evaluated.

45. It was determined on March 26, 2003, that C-Facility could resume normal operations.

46. On March 28, 2003, two inmates affiliated with the Fresno Bulldogs attempted to murder a Southern Hispanic inmate.  All inmates were denied access to the yard until April 1, 2003, when normal operations were resumed for all inmates except the Bulldogs.

47.   On April 4, 2003, the mailroom supervisor at SATF responded to an inmate appeal submitted by Noble regarding missing mail.  Noble alleged that the mailroom was withholding mail that was sent to him.  This mail was allegedly copies of legal work that Noble had sent out from the institution to be copied.

48.   The mailroom supervisor determined that the mailroom had no record of receiving a package of documents for Noble, nor could any such package be located.  Any incoming mail with a tracking number is to be logged in a permanent ledger book, and a review of the ledger did not find any record or entry for mail received for Noble between February 11, 2003, through March 12, 2003.

49.   If the package had been received in the mailroom, there are several regulations which would have resulted in the materials being returned to the sender.  The local mail policies at SATF provide that any mail exceeding two pounds would be disallowed, and the incoming mail may not include more than ten photocopied pages.

50.   These regulations serve legitimate purposes of preventing the introduction of contraband and an equitable allocation of the available resources for processing mail.

51.   SATF processes approximately 100,000 pieces of first class mail (excluding periodicals, magazines, and newspapers) on a weekly basis.  There are 7 staff, including the supervisor, assigned to the mail room.

52.   All non-confidential mail is sorted, opened, and inspected for contraband before being delivered to the housing units.  Any enclosed funds are removed and transmitted to the accounting office.  All non-confidential mail is subject to being read by staff if there is a reason to believe that it poses a danger to any person or the security of the prison.

53.   Mail is frequently used to attempt to introduce contraband, such as drugs and coded messages.  At the times alleged in the complaint the number of allowed photocopies was limited to ten pages pursuant to Operating Procedure 129.

Larger parcels (over 2 lbs.) Would be considered a package (special purchases or quarterly), and have to be pre-approved before ordering.

**D. ANALYSIS**

### 1. *Summary of Complaint*

In his Amended Complaint, Plaintiff alleges that the Defendants deprived him of access to the law library unless he could show a court ordered deadline of thirty days or less. (Am. Compl. at 6.) Plaintiff states that this caused a delay in sending out his habeas petitions which were denied because they were untimely. Plaintiff states this violated his right of access to courts. (Am. Compl. at 6)

Plaintiff also alleges that as a result of his inability to access the law library, he was required to send his legal documents to his father for photocopying. When the documents were mailed back to him, he did not receive them. Plaintiff contacted Defendant Pugliese who informed him that the mailroom did not have the documents. Plaintiff states that he is in possession of a tracking receipt showing that the mail *was* delivered to the institution. Plaintiff contacted the Defendants Adams and Espinoza regarding the mail issue and also filed an inmate grievance to no avail. Plaintiff alleges that the mail interference also violated his constitutional rights. (Am. Compl. at 7.)

Finally, Plaintiff contends that his Eighth Amendment rights were violated when during a lockdown, he was deprived of outdoor exercise for a period of eight months - from January 9, 2002 to August 13, 2003. After August 13, 2002, and through April 2003, Plaintiff was only provided with 16 two hour exercise periods. Plaintiff alleges that this violated his Eighth Amendment right to be free from cruel and unusual punishment. (Am. Compl. at 5.)

### 2. *Claims for Relief*

**a. Access to Courts**

Plaintiff alleges that he was denied access to the Court because Defendants Adams and Cuevas instituted a policy of allowing inmates access the prison library only if they could show they had a court ordered deadline of thirty-days or less. Plaintiff contends that this policy delayed his filing a habeas corpus petition by seven months and that affected the statute of

1   limitations for filing a federal habeas corpus petition.

2   Inmates have a fundamental constitutional right of access to the courts. <u>Lewis v. Casey</u>,

3   518 U.S. 343, 346 (1996). The right is limited to direct criminal appeals, habeas petitions, and

4   civil rights actions. <u>Id</u>. at 354. Claims for denial of access to the courts may arise from the

5   frustration or hindrance of "a litigating opportunity yet to be gained" (forward-looking access

6   claim) or from the loss of a meritorious suit that cannot now be tried (backward-looking claim).

7   <u>Christopher v. Harbury</u>, 536 U.S. 403, 412-15, 122 S.Ct. 2179, 2185-87 (2002). In this instance,

8   plaintiff's access claim is backward-looking, as plaintiff claims that his inability to access the

9   prison law library delayed the filing of his habeas petition and affected the statute of limitations

10  for his federal habeas petition. To prevail on his claim, plaintiff must show that he suffered an

11  actual injury by being shut out of court. <u>Id</u>. at 415; <u>Lewis</u>, 518 at 351. In order to establish

12  actual injury, the inmate must demonstrate that official acts or omissions "hindered his efforts to

13  pursue a [nonfrivolous] legal claim." <u>Lewis v. Casey</u>, 518 U.S. at 351, 353, 353, 116 S.Ct. 2174

14  n. 3.

15  Here, Defendants argue that Plaintiff has failed to establish actual injury. In support of

16  this assertion,  Defendants present evidence that Plaintiff filed a state criminal appeal of his

17  conviction on October 3, 2003. (Exh. B at 1-2, Motion for Summary Judgment ["Motion"].) The

18  California Court of Appeal denied his appeal on June 7, 2001, and he then filed a Petition for

19  Review in the California Supreme Court which was denied on August 8, 2001. (Exh. B at 2-3,

20  Motion.) Plaintiff then filed a Petition for Writ of Certiorari in the United States Supreme Court

21  which was denied on February 26, 2002. (Exh. B at 2, Motion.)

22  Plaintiff filed Petitions for Writ of Habeas Corpus in the California Court of Appeal,

23  Second Appellate District on November 21, 2002, and April 7, 2003. (Exh. B at 4-5, Motion.)

24  These Petitions were summarily denied. Plaintiff then pursued his habeas petitions in the

25  California Supreme Court which issued an Order to Show Cause returnable in the L.A. Superior

26  Court on July 13, 2004. (Exh. B at 7, Motion.)

27  Plaintiff filed a federal Petition for Writ of Habeas Corpus in the U.S. District Court for

28  the Central District of California on April 9, 2004. (Exh. B at 8, Motion.) This Petition was

voluntarily dismissed after Respondents moved to dismiss the action for Plaintiff's failure to exhaust his administrative remedies.  (Exh. B at 9, Motion.)

Plaintiff filed a second federal Petition for Writ of Habeas Corpus in the Central District on September 10, 2003.  (Exh. B at 12, Motion.)  The Respondents again moved to dismiss the Petition on exhaustion grounds but the Motion was denied on February 25, 2005, and Respondents were ordered to file a Return to the Petition.  (Exh. B at 12, 13, 16-24, Motion.)  According to the evidence presented by the Defendants, this action is still pending in the Central District of California.  (Exh. B at 15.)  Thus, according to the Defendants, Plaintiff has not suffered any adverse action and the Defendants are entitled to summary judgment on this claim.

The Court finds that Defendants have met their initial burden of informing the Court of the basis for their Motion, and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact.  The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank v. Cities Service. Co., 391 U.S. 253, 289 (1968); Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).

In his Opposition, Plaintiff argues that he has suffered actual injury because his Petition filed in the California Court of Appeal was denied with a "citation to authorities which mention 'delayed petition'." (Exh. 94-95, Opposition.)   Thus, Plaintiff contends, he has suffered actual injury because the delay stemmed from lack of access to the law library.

The Court finds Plaintiff's application of the facts to the law unpersuasive.  As a preliminary matter, the law clearly states that the right of access to the courts is merely the right to *bring* to court a grievance the inmate wishes to present, and is limited to direct criminal appeals, habeas petitions, and civil rights actions.  Lewis v. Casey, 518 U.S. 343, 354 (1996).  It

is undisputed that Plaintiff was able to file his state and federal habeas petitions as is shown by the evidence submitted by both parties.  In fact, at least one of Plaintiff's *state* habeas petitions was denied on the merits.[3]  The second was summarily denied with citation to various legal authorities which stand for multiple propositions including that issues heard on appeal will not be reconsidered in habeas corpus, piecemeal litigation of claims in successive petitions is barred, that the Petitioner has failed to provide justification for the delay in filing, and that the Petitioner failed to present mitigating evidence sufficient to warrant relief.  In re Clark, 5 Cal.4th 750, 766-767, 774-781, 782-783, 796-798 (1993).  The Court's discussion of delay in In re Clark provides that "any substantial delay in the filing of a petition after factual and legal bases for the claim are known or should have been known must be explained and justified."  Id. at 784.  Thus, it was Plaintiff's failure to explain any delay that formed *one* if he bases on which his second state habeas petition was denied.  Plaintiff is reminded, however, that there continued to be other reasons apart from delay which resulted in the denial of that second state habeas petition.

The Court is inclined to agree with the Defendants that Plaintiff has failed to establish that he was precluded or thwarted in his efforts to present a legally or factually arguable claim to the courts.  In addition, Plaintiff is has failed to demonstrate that the dismissal was based solely on the delay which Plaintiff attributes to the lack of law library access.[4]  As stated above, the first state habeas petition was denied on the merits.  The second was denied for various reasons including that the issues raised on appeal could not be heard in habeas corpus.  Accordingly, Plaintiff fails to meet his burden in demonstrating a genuine issue of material fact that supports his allegation that his habeas petition was denied on the basis of the statute of limitations and delay.  The Court will recommend summary judgment be granted with regard to this claim.

---

[3]Plaintiff's second state habeas petition, Case No. B 166128 (Exh. B-5, Motion), was denied on the merits and on the procedural ground that Plaintiff (Petitioner in the action) did not justify his failure to present his claim and evidence in the prior petition.  (Exh. 95, Opposition.)

[4]The Court also cited to In re Duvall, 4 Cal.4th 464, 474-475 (1993) which signals that the Petitioner should return with more complete pleadings; In re Mattson, 50 Cal.3d 826, 876 (1990), which provides that the Petition must show a motion would have been meritorious to establish ineffective assistance of counsel; People v. Pope, 23 Cal.3d 412, 424-426 (1979), concerning ineffective assistance of counsel claims; and People v. Madaris, 122 Cal.App.3d 234, 241-242 (1981), holding the burden of proving ineffective assistance of counsel rests with the Petitioner.

**b.  Mail Interference & Supervisory Liability**

Plaintiff next alleges that on February 11, 2003, his father mailed copies of his legal work to him but it was not delivered.  Plaintiff states that he was told by Defendant Pugliese that the mailroom did not have his mail.  However, Plaintiff states that his father provided him with a tracking receipt showing that the mail arrived at the facility on February 20, 2003.  Plaintiff states that the mail sent to him was necessary to "complete ongoing litigation" and notified each of the supervisors in the mail process but his mail continued to be withheld. (Am. Compl. At 6.) Plaintiff alleges that this action violated his First Amendment rights.

A prison inmate retains those First Amendment rights not inconsistent with his status as a prisoner or the legitimate penological objectives of the correctional system. Thus, a prison official's interference with an inmate's mail may be challenged when such interference is not reasonably related to legitimate penological interests. See Turner v. Safley, 482 U.S. 78, 89 (1987); Pell v. Procunier, 417 U.S. 817, 822 (1974).  As a general proposition, prison officials have an obligation to post outgoing mail and to deliver incoming mail promptly. See, e.g., Nicholson v. Choctaw County, 498 F. Supp. 295 (S.D. Ala. 1980).  Nevertheless, delays sometimes occur, and mail is occasionally lost; these delays and losses are not unconstitutional unless they occur as a result of a systematic breakdown in the prison mail system or as a result of either intentional interference with a prisoner's mail rights or deliberate indifference to those rights. Grady v. Wilen, 735 F.2d 303 (8th Cir. 1984); Armstrong v. Lane, 771 F. Supp. 943 (C.D. Ill. 1991) (unintentional losses and delays of plaintiff's mail, "while understandably frustrating ⋯ fail to rise to the level of a constitutional violation").

The Court has re-read Plaintiff's Amended Complaint and finds that it fails to state a cognizable claim for relief.  As a preliminary matter, Plaintiff only complains of one instance where his mail was not given to him.  Plaintiff names Defendant Pugliese however, he does not allege specific facts linking Defendant Pugliese to an act or omission giving rise to a constitutional violation.  The Amended Complaint states only that Defendant Pugliese told Plaintiff that he did not have his mail.  As noted above, unintentional losses or delays of an inmate's mail alone fails to give rise to a constitutional violation.  As noted by Defendants,

1   Plaintiff's claim is more like a deprivation of property claim.

2       Even assuming Plaintiff's allegation gives rise to a cognizable claim for relief,

3   Defendants argue that there existed regulations that would have precluded delivery of Plaintiff's

4   mail as described.  First, Defendants present evidence that the Defendants have no record that the

5   mail was ever received at SATF.  (Exh. E at 2 [Decl. of Def. Pugliese], Motion.)  Incoming mail

6   with a tracking number is logged in a permanent ledger book and the book showed no entry for

7   mail received for Plaintiff between February 11, 2003, through March 12, 2003.  Id. at 3.

8   However, even had the mail been received, incoming mail may not include more than ten

9   photocopied pages.  Of course, the number of photocopies contained is unknown as the mail was

10  not delivered to Plaintiff.  In any event, because Plaintiff contends that Defendant Pugliese is

11  responsible for the failed mail delivery, his allegations are more like a deprivation of property

12  claim.

13      An "unauthorized intentional deprivation of property by a state employee does not

14  constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth

15  Amendment if a meaningful postdeprivation remedy for the loss is available."  Hudson v.

16  Palmer, 468 U.S. 517, 533 (1984).  Thus, where the state provides a meaningful postdeprivation

17  remedy, only authorized, intentional deprivations constitute actionable violations of the Due

18  Process Clause.  An authorized deprivation is one carried out pursuant to established state

19  procedures, regulations, or statutes.  Piatt v. McDougall, 773 F.2d 1032, 1036 (9th Cir. 1985);

20  see also Knudson v. City of Ellensburg, 832 F.2d 1142, 1149 (9th Cir. 1987).  Because a

21  deprivation of the type alleged in plaintiff's complaint is unauthorized, and because the state does

22  provide a meaningful postdeprivation remedy, plaintiff has not stated a cognizable procedural

23  due process claim.[5]

24      In this case, Plaintiff's Amended Complaint states an unauthorized deprivation of

25  property as no regulation was cited for the deprivation and Plaintiff alleges that Defendant

26  ─────────────

27      [5]Plaintiff's allegation that there was no adequate post-deprivation remedy available is also unpersuasive.
    Plaintiff  concedes in his Amended Complaint and Opposition that he grieved the failed-mail-delivery by using the
28  602 form and also by letter to the Warden and Supervisor.  (Am. Compl. at 7.)  Plaintiff's allegation that the
    postdeprivation remedy was inadequate is based solely on the fact that he did not receive the response he sought.

1  Pugliese withheld his property without good reason.  Such allegations, however, do not give rise

2  to a constitutional claim for relief.      Further, and contrary to Plaintiff's assertions, his mail does

3  not constitute "legal" correspondence.  The Court's have held that correspondence between an

4  attorney and a client is entitled to special protection under the attorney-client privilege.

5  However, "[m]ail from the courts, as contrasted to mail from a prisoner's lawyer, is not legal

6  mail." Keenan v. Hall, 83 F.3d 1083, 1094 (9th Cir. 1996).  "All correspondence from a court to

7  a litigant is a public document, which prison personnel could if they want inspect in the court's

8  files." Id. at 1094 (citing to Martin v. Brewer, 830 F.2d 76, 78 (7th Cir. 1987)).  Similarly, mail

9  from Plaintiff's father to him, even if legal in nature, is not "legal" mail subject to heightened

10  protection.

11      Finally, assuming Plaintiff's allegations give rise to an access to court claim, Plaintiff

12  again fails to show actual injury.  Plaintiff's Amended Complaint cites limited law library access

13  and withholding of mail as reasons why his state habeas case was denied. (Am. Compl at 6.)

14  However, as discussed in the preceding section, Plaintiff's first state habeas petition was heard

15  on the merits and the second denied for several other reasons including delay.  As such, the Court

16  finds Plaintiff fails to show actual injury and there is no disputed issue of fact warranting trial on

17  the alleged withholding of mail against Defendant Pugliese.

18      Plaintiff also fails to state a cognizable claim against Defendants Adams and Espinoza.

19  The Amended Complaint alleges that these Defendants failed to train or properly supervise their

20  employees with regard to mail delivery.

21      Supervisory personnel are generally not liable under Section 1983 for the actions of their

22  employees under a theory of respondeat superior and, therefore, when a named defendant holds a

23  supervisory position, the causal link between him and the claimed constitutional violation must

24  be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v.

25  Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979).  To state a claim

26  for relief under Section 1983 based on a theory of supervisory liability, Plaintiff must allege

27  some facts that would support a claim that supervisory Defendants either: personally participated

28  in the alleged deprivation of constitutional rights; knew of the violations and failed to act to

prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (*internal citations omitted*); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  Although federal pleading standards are broad, some facts must be alleged to support claims under section 1983.  See Leatherman v. Tarrant County Narcotics Unit, 507 U.S. 163, 168 (1993).

Although Plaintiff states that he wrote to the Defendants to inform them that his mail was being withheld, he has not alleged any facts indicating that Defendants personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'"  Hansen v. Black at 646.  The fact that Plaintiff informed the Defendants that his mail had been withheld alone is insufficient to give rise to a constitutional violation.  Again, even assuming it did, Plaintiff does not present evidence to create a disputed issue of fact warranting trial on the mail claim against Defendants Adams and Espinoza.  Accordingly, the Court will recommend summary judgment be granted with regard to the mail claim against Defendants Pugliese, Adams and Espinoza.

### c. Eighth Amendment - Exercise

The deprivation of outdoor exercise by prison officials to prisoners can constitute cruel and unusual punishment in violation of the Eighth Amendment. Spain v. Procunier, 600 F.2d 189 (9th Cir.1979). "[S]ome form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates." Id. at 199. The long-term deprivation of outdoor exercise is a denial of a basic need in violation of the Eighth Amendment. Allen v. Sakai, 48 F.3d 1082, 1087-1088 (9th Cir.1994); see also, Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir.1996) (defendants not entitled to summary judgment where plaintiff produced evidence showing deprivation of outdoor exercise for six-month period in administrative segregation). Regular outdoor exercise is necessary "unless inclement weather, unusual circumstances, or disciplinary needs ma[k]e that impossible." Spain, *supra*, at 199.   In Hayward v. Procunier, 629

F.2d 599, 603 (9th Cir.1980), the Ninth Circuit found that the deprivation of outdoor exercise and a five-month lockdown in response to a genuine emergency did not violate the Eighth Amendment; however, plaintiffs therein "were allowed approximately the minimum exercise mandated in Spain within a month after imposition of the lockdown." Id.

In this case, Defendants argue that they were not deliberately indifferent in imposing and continuing the lockdown that resulted in the alleged deprivation of time outside Plaintiff's cell. In support of this, Defendants provide numerous exhibits and declarations of the events surrounding the lockdown in January 2002, and those events occurring after the lockdown. However, Defendants do not provide evidence to refute the allegations made by Plaintiff in the Amended Complaint.

Plaintiff alleges specifically that Defendants Adams and Cuevas violated his Eighth Amendment right to be free from cruel and unusual punishment by depriving him of outdoor exercise. Plaintiff alleges that he was granted "no yard, sunlight or outdoor exercise" from January 9, 2002 through August 13, 2002, and that after August 13, 2002, to April 2003, he was given only 16 two-hour yard periods. (Am. Compl. at 5.) Defendants Motion consists of information and evidence generally describing the events that precipitated the lockdown in January of 2002, and surrounding the extended lockdown that ensued thereafter. However, Defendants point to no specific facts concerning Plaintiff and/or whether he was allotted time out of his cell, what kind, when and for how long. As stated above, the moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Although Defendants provide general background information and evidence regarding the events that resulted in the lockdown and caused a continued lockdown, Defendants fail to address the specific allegations in the Complaint that Plaintiff was denied time out of his cell for a period of eight months, or that he was given only 16 two hour exercise periods in eight months. Accordingly, the Court must

RECOMMEND that the Motion for Summary Judgment with respect to Plaintiff's Eighth Amendment claim be denied.

**E. CONCLUSION AND RECOMMENDATION**

The Court RECOMMENDS that the Motion for Summary Judgment be GRANTED with respect to Plaintiff's access to courts, mail interference and supervisory liability claims against the Defendants, and that the Motion be DENIED without prejudice regarding the Eighth Amendment exercise claim against Defendant Cuevas and Adams.  The Court further RECOMMENDS that Defendants be granted the opportunity to file a second Motion for Summary Judgment addressing this remaining issue within thirty (30) days of the resolution of these Findings should Defendants choose to do so.

The Court further ORDERS that these Findings and Recommendations be submitted to the United States District Court Judge assigned to this action pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within THIRTY (30) days after being served with a copy of these Findings and Recommendations, any party may file written Objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the Objections shall be served and filed within TEN (10) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file Objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:** __**March 23, 2007**__ _____**/s/ Sandra M. Snyder**_____
b6edp0                                                UNITED STATES MAGISTRATE JUDGE