# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

STEVEN JOSEPH NOBLE, IV,

                Plaintiff,

    v.

D. ADAMS, et. al.,

                Defendants.

_____/

1:03-CV- 5407  AWI SMS P

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT IN
PART AND DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT IN
PART

(Doc. 104)

## A.  RELEVANT PROCEDURAL HISTORY

Steven Joseph Noble  ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff filed an Amended Complaint on May 12, 2003, on which this case is proceeding.  In the amended complaint, Plaintiff alleges that his constitutional rights were violated during a lockdown at the California Substance Abuse Treatment Center ("SATF") at Corcoran, California.  Plaintiff contends he was denied access to the courts, that prison officials unlawfully interfered with his mail, and that Defendants Cuevas and Adams violated his Eighth Amendment rights by limiting his access to outdoor exercise from January 9, 2002, to April 2003.  Specifically, Plaintiff alleges that he was denied access to outdoor exercise from January 9, 2002 through August 13, 2002, and was granted only 16 two hour yard periods between August 13, 2002 and April 2003.

On December 7, 2006, Defendants filed a Motion for Summary Judgment.[1]  Plaintiff filed his Opposition to the Motion on February 27, 2007.  On March 26, 2007, the Magistrate Judge issued Findings and Recommendations that Defendants' motion be granted on Plaintiff's denial of access to the courts and mail interference claims.  However, the court found that with regard to Plaintiff's Eighth Amendment claim, that Defendant Adams and Cuevas failed to refute the allegations in the complaint.  Specifically, that Defendants  failed to provide any facts concerning when Plaintiff was allotted time out of his cell, and for how long, during the period in question.  After reviewing the objections filed in this matter, this court adopted the Findings and Recommendations on May 18, 2007.  The court gave Defendants an opportunity to file a second motion for summary judgment.  Defendants filed their renewed motion on June 21, 2007.  Plaintiff filed his opposition on July 27, 2007.  Defendants filed their reply on August 6, 2007.  After reviewing all of the evidence presented in this case, the court issues the following order.

**B. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a Summary Judgment Motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of

---

[1] On December 3, 2004, prior to filing the motion for summary judgment, Defendants also moved to dismiss the action on the grounds that Plaintiff failed to exhaust his administrative remedies.  An amended motion was submitted on December 21, 2004. The Magistrate Judge issued Findings and Recommendations that the motion be denied on August 19, 2005.  This court adopted the Findings and Recommendations on September 21, 2005.

1   an element essential to that party's case, and on which that party will bear the burden of proof at

2   trial. <u>Id</u>. at 322.  "[A] complete failure of proof concerning an essential element of the

3   nonmoving party's case necessarily renders all other facts immaterial." <u>Id</u>.  In such a

4   circumstance, summary judgment should be granted, "so long as whatever is before the district

5   court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

6   satisfied." <u>Id</u>. at 323.

7        If the moving party meets its initial responsibility, the burden then shifts to the opposing

8   party to establish that a genuine issue as to any material fact actually does exist. <u>Matsushita Elec.</u>

9   <u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to establish the

10   existence of this factual dispute, the opposing party may not rely upon the denials of its

11   pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or

12   admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e);

13   <u>Matsushita</u>, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in

14   contention is material, i.e., a fact that might affect the outcome of the suit under the governing

15   law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>T.W. Elec. Serv., Inc. v. Pacific</u>

16   <u>Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e.,

17   the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Wool</u>

18   <u>v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

19        In the endeavor to establish the existence of a factual dispute, the opposing party need not

20   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

21   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

22   trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

23   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

24   <u>Matsushita</u>, 475 U.S. at 587 (*quoting* Fed. R. Civ. P. 56(e) advisory committee's note on 1963

25   amendments).

26        In resolving the Motion for Summary Judgment, the Court examines the pleadings,

27   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

28   any.  Rule 56(c).  The evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at

255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (*citing* <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)(*per curiam*).   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.   <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.   Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (*citation omitted*).

**C.  UNDISPUTED FACTS**[2]

1.   On September 1, 2000, Plaintiff, Steve Joseph Noble, D-74884, was sentenced to state prison for the crime of grand theft of property from a person.

2.   Plaintiff was in the Level IV general population, at SATF at the times relevant in this case.[3]

3.   Plaintiff, Steve Joseph Noble, is African American.

4.   Plaintiff has been identified by prison officials as an ex-member of the 78th Street Crips, which is a street gang, considered to be a disruptive group within the state prisons.

5.   At all times relevant to this case, Defendant Cuevas was a Correctional Captain,

---

[2] The following facts are undisputed for the purpose of the instant motion and do not apply to any subsequently filed motion.  Plaintiff disputes numerous facts presented by the Defendants on the basis that he disagrees with the policy, or disagrees based on his own personal opinion with certain facts.  However, such comments do not render the facts disputed.  Many of the facts listed are simply statements about what a particular policy states.  Although Plaintiff disagrees with the policy or the handling of a situation on any given day, that in and of itself does not render a fact disputed.

[3] Defendants assert in their renewed motion for summary judgment that Plaintiff was in the Level IV general population.  However, Defendants also attached documents at Exhibit H of their Supplemental Statement of Undisputed Facts indicating that Plaintiff was in administrative segregation and the Corcoran Security Housing Unit (SHU) at various times between 11/26/03 and 6/24/2004.  Plaintiff disputes that he was in administrative segregation or the SHU during those times.  Since both parties agree that Plaintiff was in the general population for the majority of time relevant to this case, the disputes over those specific dates are not material.

1    employed at California Substance Abuse Treatment Facility.

6.    Regulations of the Department of Corrections provide that the Warden of the prison is responsible for declaring a state of emergency, which temporarily suspends normal operations.

7.    The Warden determines when it is safe to lift a lockdown.

8.    The entire population of C-Facility at SATF was placed on lockdown status on December 31, 2001, because of a riot.  On January 8, 2002, it was determined that all inmates in C-Facility, with the exception of one disruptive group could be released to normal program, including yard access.

9.    One day later, on January 9, 2002, a group of African-American inmates on the C-Facility, yard,  attempted to murder a correctional officer, and assaulted numerous other correctional staff.  This incident immediately followed an inmate-on-inmate assault.

10.   After the initial assault incident was controlled, the inmates on the yard were recalled back to their respective buildings.  As part of processing the inmates into their housing units, they were subjected to unclothed body searches.  A number of inmates who were still on the yard saw that staff were searching all inmates before allowing them to enter the housing units and apparently decided to discard their weapons.

11.   As inmates were being searched, an inmate, later identified as Moreno, incited a number of African-American inmates to assault staff.  Other staff responded to stop the assault, while other inmates joined in the attack.  Eventually, between ten and twenty-one inmates were identified as participants in the attack. Approximately twenty-one staff members reported injuries as a result of the inmate assaults, and nine were taken to outside hospitals for evaluation and treatment.

12.   After the riot was controlled, the Warden declared a state of emergency and the institution was placed on lockdown status.

5

13. A State of Emergency exists when there is a suspension of any non-essential operation, procedure, service or function and the normal time limits or schedules for activities for the purpose of preventing, containing or controlling a disturbance.

14. The suspension of normal operations of a prison is commonly called a "lockdown" because all or a portion of the inmate population are confined to their cells. The approval of the Director of Corrections must be obtained if; the lockdown of all housing units exceeds 24 hours; the lockdown of less than all of the housing units exceeds 72 hours; or the suspension of major program activities such as academic programs, exercise; or visiting, exceeds 72 hours.

15. A state of emergency is to be under constant review and evaluation. The goal is to restore normal operations as quickly as possible. A state of emergency is terminated when the Warden determines it is safe to do so.

16. When a disturbance or an incident of violence occurs the first actions taken are those necessary to end the disturbance and to provide medical treatment to those who are injured. Administrative staff, including, but not limited to, the Warden, the Administrative Officer of the Day, the Captain and the Regional Administrator are notified. All necessary paperwork is then completed, this may include documentation necessary to confine inmates to administrative segregation, as well as reports of the staff observing or involved in the control of the incident.

17. After a lockdown is imposed an investigation of the incident(s) is initiated. The investigation is for the purpose of determining the cause of the disturbance and to assist in determining whether it is safe to release inmates from lockdown status.

18. All inmates in the area in which the lockdown is imposed are interviewed. All cells and common areas are searched. Members of the Inmate Advisory Council (elected inmate representatives) are interviewed to both develop and substantiate information. Central files are reviewed to verify information. When the investigation is complete,  it is the responsibility of the Captain to develop a plan

1    for releasing inmates from lockdown status.

2    19.   A lockdown can be released immediately, if it is determined that there is little or

3          no danger of repeated violence.  These situations commonly involve a small

4          number of inmates with a personal dispute, such as a debt.

5    20.   A lockdown can continue for an extended period of time if the information

6          developed during the investigation indicates that there is a likelihood of continued

7          violence.  A lengthy lockdown may involve large scale disturbances between rival

8          prison gangs or different ethnic groups, or large scale disturbances resulting in

9          violence directed towards staff. If the violence is gang related or racially

10         motivated the lockdown may be limited to particular ethnic groups.

11   21.   Every lockdown is to be continuously reevaluated in an effort to return the prison

12         to normal operations.  Lockdowns are generally released gradually.  Critical

13         workers, who are part of non-involved groups, are identified for release to their

14         work assignments, which include food services, laundry and sanitation jobs.  A

15         schedule for showers is generally implemented within a few days of imposing a

16         lockdown.

17   22.   The investigative process and the process of releasing inmates from a lockdown

18         can include individual and group interviews with all inmates.  It can also include

19         the release of inmate "representatives" for the purpose of allowing them to speak

20         with other inmates about the lockdown and any ongoing disputes between various

21         ethnic groups.  Other efforts may include attempts to mediate any underlying

22         dispute among the inmate groups.

23   23.   When a determination has been made that a lockdown can be lifted the unlock is

24         implemented gradually.  A determination is made of those inmates most likely to

25         program successfully.  They are released first, in controlled groups making sure

26         that no ethnic group has numerical superiority.  All inmates released to the

27         exercise yard are subjected to unclothed body searches and metal detectors are

28         used as well.

24. The number of inmates released from lockdown is gradually increased until all inmates are returned to normal program. If there is any serious incident during the unlock process the lockdown is re-instituted.

25. The lockdown at SATF was imposed to protect the safety and security of staff, the institution and inmates. A significant number of staff needed immediate medical attention, including nine that were taken to outside hospitals.

26. The investigation of the attempted murder of the correctional officer was immediately initiated. It was critical to determine whether this was a planned or spontaneous attack, if it was specifically directed toward the officer assaulted, or if he was a target of opportunity.

27. It was initially determined that the sixteen African-American inmates involved in the assault were affiliated with the "Crips," "415's" and "Bloods," which are street gangs identified by the Department of Corrections and Rehabilitation as disruptive groups. The mass assault on staff at SATF was an unprecedented event. It was also unusual because of the combination of normally rival disruptive groups acting together.

28. On January 16, 2002, non-contact visiting was reinstated. This allowed inmates to be out of their cells for visits. All movement was done in restraints and by escort only. It was still unknown when the lockdown could be released.

29. On February 13, 2002, inmates were allowed access to the canteen, with a spending limit of $45.

30. On April 11, 2002, normal visiting was restored for African-American and white inmates, however, the Northern Hispanics inmates were kept on non-contact visiting status. The Northern Hispanic inmates were on modified program due to an incident that occurred in December 2001.

31. The investigation of the incident continued until it was determined that the assault on staff was not a pre-planned attack. A number of African-American inmates had armed themselves on January 9, 2002, because they anticipated an assault by

8

Hispanic inmates.  The assault by one white inmate on another apparently prevented this anticipated assault.  When the African-American inmates observed that all inmates were being subjected to unclothed body searches, before they were allowed to enter their housing units, some of them discarded their weapons.

32.    Inmate Moreno, who incited the other African-American inmates to attack staff had a grudge against a particular officer, but his gang had not sanctioned an attack on the officer.  As he was waiting to be given an unclothed body search, he seized the opportunity to assault the targeted officer.  The other inmates who joined in the attack on staff, were incited to participate by inmate Moreno.  Four stabbing weapons were found within the area of the attack.  Three other weapons were found nearby.

33.    After it was determined that the assault on staff was not pre-planned, additional steps could be taken to gradually restore normal programing.

34.    On June 27, 2002, a meeting was held between Captain Cuevas, his staff, and selected inmates representing the African-American inmate population in C-Facility.  The purpose of the meeting was to notify the inmates about the proposals for modifying the lockdown in C-Facility.  A decision was made to open the day-room for African-American inmates who were not affiliated with a gang or disruptive group, on July 8, 2002.

35.    The goal of this modification was to observe the controlled release of inmates, and if the program ran without further acts of violence, the day-room would then be opened for the remaining African-American population.  If the day-room program proved disruptive, the releases would be stopped and evaluated before another attempt was made to start releasing inmates from the lockdown.

36.    On July 19, 2002, all African-American inmates were allowed access to the day-room on a rotational basis.

37.    On August 1, 2002, an administrative decision was made to open the exercise yard to all inmates for a modified program, this plan was to release one building at a

1    time, on a rotational basis.  This plan was implemented on August 4, 2002.

2    38.    On August 8, 2002, the plan was modified to exclude Southern Hispanic, Fresno

3           Bulldogs, and Northern Hispanic inmates (inmates considered to be affiliated with

4           disruptive groups).  The releases were then limited to one tier of one building at a

5           time, on a rotational basis.

6    39.    On November 15, 2002, C-Facility was again locked down because of a battery on

7           an inmate with a weapon, on November 14,2002.  There had also been several

8           other incidents of weapons possession.

9    40.    The modified outdoor exercise schedule was resumed on November 27, 2002.

10          Hispanic and white inmates continued to be locked down.  White inmates were

11          released from lockdown on December 3, 2002.

12   41.    African-American inmates were returned to lockdown status because of a battery

13          on a peace officer on February 13, 2003.  It was necessary to evaluate this incident

14          to determine if it was an isolated incident of opportunity, or was a planned,

15          organized assault.

16   42.    All of C-Facility was placed on lockdown status on March 21, 2003, to search the

17          entire facility for weapons. Numerous weapons had been found on two prior,

18          separate occasions.  The searches were completed, and the continuation of the

19          lockdown was evaluated.

20   43.    It was determined on March 26, 2003, that C-Facility could resume normal

21          operations.

22   44.    On March 28, 2003, two inmates affiliated with the Fresno Bulldogs attempted to

23          murder a Southern Hispanic inmate.  All inmates were denied access to the yard

24          until April 1, 2003, when normal operations were resumed for all inmates except

25          the Bulldogs.

26   45.    Twenty-four inmates were transferred out of SATF after the January 9, 2002,

27          incident.  Sixteen inmates were charged with disciplinary offenses, ranging from

28          attempted murder to participation in a riot.

46.     Plaintiff was not provided with any out of cell exercise period from January 9, 2002 until August 13, 2002.  Between August 13, 2002 to April 2003 Plaintiff was only provided sixteen two hour exercise periods. [4]

47.     During some of the time alleged in the complaint, Plaintiff suffered from episodes of depression, developed skin rashes, headaches, and respiratory difficulties. Plaintiff was seen by medical professionals in March 2002 for depression and received medication to treat the depression through July 2002.  He was evaluated in August 2002 when his mood was described as good, he had no obsessions, or suicidal ideation.

**D.  ANALYSIS**

*1.      Summary of the Remaining Claim in Plaintiff's Complaint*

Plaintiff contends that his Eighth Amendment rights were violated when during a lockdown, he was deprived all outdoor exercise for a period of eight months - from January 9, 2002 to August 13, 2003.  After August 13, 2002, and through April 2003, Plaintiff was only provided with 16 two hour exercise periods.  Plaintiff alleges that this violated his Eighth Amendment right to be free from cruel and unusual punishment. (Am. Compl. at 5.)

*2.      The Eighth Amendment - Generally*

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain . . . ."  <u>Rhodes v.</u>

---

[4] Because Plaintiff was in the general housing unit, Defendants cannot specify with accuracy when Plaintiff was allowed exercise.  Defendants contend that between August 4, 2002, to March 21, 2003, the prison provided for outdoor exercise every nine days for three hours.  Defendants conceded that there are no records of Plaintiff's access to the exercise yard, nor do they have a way to refute the number of times Plaintiff was given access to the yard.  However, Defendants' submitted a copy of the yard schedule for December 2002 which shows that each group in facility C was given three periods of three hours of exercise in the month of December 2002. Defendants' Supplemental Statement of Undisputed Facts (Doc. 106) at Exhibit H.  Defendants contend that in theory, Plaintiff could have gotten as many as eighteen periods of three hours of exercise between August 2002 and April 2003.

Plaintiff submitted evidence that he only received 16 two hour periods of exercise during the period outlined above.  Plaintiff's Declaration filed on February 27, 2007 (Doc. 95) at pg. 13 -14 (Plaintiff's Exhibit 13) and pg. 100 (Plaintiff's Exhibit 82).   When deciding a motion for summary judgment, the evidence of the opposing party is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587 (*citing* <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)(*per curiam*).  Therefore, for the purposes of this motion, the court adopts Plaintiff's version of the evidence.

1   Chapman, 452 U.S. 337, 347 (1981).  Although prison conditions may be restrictive and harsh,

2   prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and

3   personal safety.  Id.; Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986); Hoptowit v.

4   Ray, 682 F.2d 1237, 1246 (9th Cir. 1982).  Where a prisoner alleges injuries stemming from

5   unsafe conditions of confinement, prison officials may be held liable only if they acted with

6   "deliberate indifference to a substantial risk of serious harm."  Frost v. Agnos, 152 F.3d 1124,

7   1128 (9th Cir. 1998).

8         The deliberate indifference standard involves an objective and a subjective prong.  First,

9   the alleged deprivation must be, in objective terms, "sufficiently serious . . . ."  Farmer v.

10   Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Second,

11   the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . .

12   . ."  Farmer, 511 U.S. at 837.  Thus, a prison official may be held liable under the Eighth

13   Amendment for denying humane conditions of confinement only if he knows that inmates face a

14   substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it.

15   Id. at 837-45.  Prison officials may avoid liability by presenting evidence that they lacked

16   knowledge of the risk, or by presenting evidence of a reasonable, albeit unsuccessful, response to

17   the risk.  Id. at 844-45.  A prison official's duty under the Eighth Amendment is to ensure

18   "'reasonable safety,'" a standard that incorporates due regard for prison officials unenviable task

19   of keeping dangerous men in safe custody under humane conditions.  Whether one puts it in

20   terms of duty or deliberate indifference, prison officials who act reasonably cannot be found

21   liable under the Cruel and Unusual Punishments Clause.  Id.

22        **3.**      ***The Eighth Amendment and Access to Exercise***

23         "'[S]ome form of regular outdoor exercise is extremely important to the psychological

24   and physical well being of the inmates.'"  Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1995)

25   (quoting Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979)).  Thus, "[the] deprivation of

26   outdoor exercise [can] constitute cruel and unusual punishment."  Allen, 48 F.3d at 1087.  While

27   the temporary denial of outdoor exercise with no medical effects is not a substantial deprivation,

28   May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997), in this Circuit, the deprivation of regular

1  outdoor exercise for a prolonged period,  is unquestionably sufficient to meet the objective

2  requirement of the Eighth Amendment analysis. <u>Lopez v. Smith</u>, 203 F.3d 1122, 1132-33 (9th

3  Cir. 2000) (denial of all outdoor exercise for six weeks meets objective Eighth Amendment

4  requirement); <u>Allen</u>, 48 F.3d at 1086-88 (forty-five minutes of outdoor exercise per week for six

5  weeks meets objective Eighth Amendment requirement).  Regular outdoor exercise is necessary

6  "unless inclement weather, unusual circumstances, or disciplinary needs ma[k]e that impossible.

7  <u>Spain</u>, supra, 600 F. 2d at 199.  In this case, Defendants' concede that Plaintiff's deprivation of

8  exercise for seven months, and the limited access to exercise for the succeeding eight months is

9  sufficiently serious to constitute and objective risk to Plaintiff's health.  The question in this case

10  rests on whether Defendants acted with sufficient subjective intent to constitute deliberate

11  indifference.

12         ***4.        The Eighth Amendment Right to Exercise During a Lockdown***

13         Prison officials must meet Eighth Amendment standards in providing basic human needs

14  to prisoners during a lockdown.  However, when a genuine emergency exists, prison officials

15  may be more restrictive than they can be otherwise.  Courts must give reasonable leeway to the

16  decisions prison officials make when there is a lockdown.  <u>Hoptowit v. Ray</u>, 682 F. 2d at 1237,

17  1259 (9th Cir. 1982):

18           ... When a genuine emergency exists, prison officials may be more
         restrictive than they otherwise may be, and certain services may be
19           suspended temporarily.  The more basic the particular need, the shorter
         time it can be withheld.  It is doubtful for example that any circumstance
20           would permit a denial of access to emergency medical care.  Less critical
         needs may be denied, however, for reasonable periods of time when
21           disciplinary needs warrant. (quoting <u>Spain v. Procunier</u>, 600 F. 2d at 199.
         In determining the existence of such needs, we must give reasonable
22           leeway to prison officials (quoting <u>Hayward v. Procunier</u>, 629 F. 2d. at
         603). <u>Id</u>.
23

24         In <u>Spain v. Procunier</u>, the court found that prisoners' Eighth Amendment rights had been

25  violated when there was no lockdown, but prisoners were confined to continuous segregation

26  virtually 24 hours a day for four years.  During this time, prisoners were given very limited, and

27  in some cases,  no exercise.  <u>Spain v. Procunier</u>, 600 F. 2d at 199.  The court recommended that

28  prisoners in these conditions should receive one hour of exercise a day, five days a week.  <u>Id</u>.

1    In Hayward v. Procunier, 629 F. 2d. 599, 603 (9th Cir. 1980), the Ninth Circuit examined

2    prisoners' access to exercise during a lockdown.  The court determined that deprivation to

3    outdoor exercise and a five-month lockdown in response to a genuine emergency did not violate

4    the Eighth Amendment.  However, in Hayward, plaintiffs "were allowed approximately the

5    minimum exercise mandated in Spain within a month after the imposition of the lockdown."  Id.

6    The circumstances of this case falls between the parameters of the Spain and Hayward

7    decisions.  When examining conditions of confinement during a lockdown situation, the court

8    should "consider whether each specific restriction imposed amounted to an infliction of pain

9    without penological purpose."  Hoptowit v. Ray, 682 F. 2d at 1259.  In making this evaluation,

10   "the district judge should consider the length of time each restriction was in effect, and whether

11   the restriction and its duration bore a relationship to legitimate attempts to ease the emergency."

12   Id.

13   ### 5.      *Defendants Cuevas and Adams*

14   Defendants argue that summary judgment should be granted in this case because

15   Defendants acted reasonably in imposing and continuing the lockdown since the restrictions were

16   responses to a genuine emergency.  In support of their argument, they rely on the history of the

17   events leading up to, and subsequent to, the lockdown.[5]

18   ### A. *The Lockdown on January 9, 2002*

19   Upon an examination of Defendants' evidence, the court finds that Defendants Adams

20   and Cuevas were not deliberately indifferent when they locked down the prison on January 9,

21   2002.  Defendants have presented sufficient evidence that the riot was a serious event.  Over ten

22   inmates were identified as participants in the riot, and the attack resulted in serious injuries to

23   approximately twenty-one staff.  Nine of the staff needed to be taken to the hospital.

24   Even Plaintiff's declaration confirms that there was a substantial amount of violence at

25   the prison that day.  Prior to the riot starting, Plaintiff witnessed four to five inmates fighting in

26   front of him.  Plaintiff's Declaration filed on Feb. 27, 2007; Doc. 95 at pg. 10. After staff had

27

28   [5] The court will not reiterate the facts here as they are outlined in the undisputed facts section. See, Section
     C, supra.

1  broken up that fight, Plaintiff states that he saw a "Crips[6]" gang member fighting with a staff

2  member. Id. at 11.  Thereafter, approximately six to nine other "Crips" gang members went to

3  assist the first "Crips" member because several officers had converged upon him. Id. One of the

4  inmates had gotten control of the officer's baton and was beating the officer with it.  Id.

5          Plaintiff argues that Defendants' reactions to the riot was exaggerated and that the riot did

6  not justify the extended lockdown.  Id at 11-12.  Plaintiff contends that the events leading up to

7  the riot on January 9, 2002, were due to prison officials unnecessarily locking down Facility C,

8  taking away privileges from inmates, and making prisoners submit to warrantless strip searches.

9  Id. at 8. As a result, tensions mounted between staff and inmates. Id. at 8.   Plaintiff further avers

10 that the inmates' violent responses on January 9, 2002, were in response to inappropriate attacks

11 by staff.  Id. at 11.

12         Even if the court accepts Plaintiff's version of events leading up to January 9, 2002, and

13 the circumstances surrounding the riot as true, Plaintiff's arguments must still be rejected.  The

14 Ninth Circuit has determined that whether the state of affairs at the prison leading up to the

15 lockdown was the fault of the prison officials is irrelevant for the purpose of evaluating

16 conditions during the lockdown.  Hoptowit v. Ray, 682 F. 2d at 1259.  "... [P]rison officials have

17 a right and a duty to take the necessary steps to reestablish order in a prison when such order is

18 lost.  This is for the benefit of the prisoners as much as for the benefit of the prison officials." Id.

19 Defendants unquestionably have a need to preserve the safety and security of the institution,

20 which includes protecting staff and inmates.  Bell v. Wolfish, 441 U.S. 520, 546-47 (1979).

21 Accordingly, the court is not persuaded by Plaintiff's arguments that the lockdown was

22 unnecessary.

23         B. *August 1, 2002 through April 1, 2003* [7]

24         Moreover, the court finds that prison officials were not deliberately indifferent after

25

26          [6] "Crips" refers to a particular inmate gang.

27          [7] The court notes that on August 1, 2002, only the decision was made to begin the modified exercise
   program, however, the program did not begin until August 4, 2002. Plaintiff did not receive exercise until August 13,
28 2002.

1   August 1, 2002 to April 1, 2003, when the decision was made to open the exercise yard to all

2   inmates on a modified program that entailed releasing one building at a time to the yard on a

3   rotational  basis.  This finding includes all of the restrictions that were imposed on the program

4   and then modified after a reasonable amount of time including:  1) when Facility-C was locked

5   down and restrictions were placed on the exercise program on November 14, 2002 because of a

6   battery on an inmate with a weapon, 2) when African Americans were returned to lockdown

7   status because of a battery on a peace officer on February 13, 2003,  3) when the entire prison

8   was locked down on March 21, 2003 to search for weapons, and 4) when all inmates were denied

9   access to the yard on March 28, 2003 to April 1, 2003, as a result of an attempted murder by two

10  Fresno Bulldogs on a Southern Hispanic inmate.   Accordingly, the court grants Defendants'

11  motion with regard to the August 1, 2002 to April 1, 2003 time frame.

12       Plaintiff alleges that prison officials were deliberately permitting prison gangs to clash

13  with each other after August 2002, so that they could prolong the lockdown period and that

14  prison officials racially discriminated against Black inmates in doing so.  Plaintiff's Opposition

15  to Defendants' Renewed Motion for Summary Judgment, Doc. 108 at pg. 46-47.  Plaintiff lists

16  the following events in support of his argument : 1) a riot between white inmates and the

17  "Bulldogs[8]" on September 13, 2002, 2) a battery by the Bulldogs on another inmate on

18  September 27, 2002, and 3) an incident where a Black inmate committed battery on October 27,

19  2002. Id.  Plaintiff asserts that all Black inmates were placed on lockdown following the October

20  27, 2002 incident, and by omission implies that White and Bulldog inmates suffered no adverse

21  consequences for their acts of violence.  However, in all instances, Defendants' documents show

22  that White and Bulldog inmates were also placed on lockdown status following the incidents they

23  were involved in.  Doc. 84-9 at 1-4.

24       Moreover, Plaintiff alleges that on November 13 and 14, 2002, that administrators began

25  releasing all prison gangs from lockdown.  However, the documentation shows that not all gangs

26  were released.  Bulldogs and Southern Hispanics in building two were to remain on lockdown

27

28       [8] "Bulldogs "refers to a particular prison gang.

1    status on November 12, 2002, and whites and Southern Hispanics were on lockdown on

2    November 13, 2002. Doc. 84-9 at 6-7.  Furthermore, Plaintiff alleges that administrators

3    arbitrarily decided to lockdown all inmates on November 15, 2002.  However, the documentation

4    shows that the lockdown was not arbitrary, but was due to incidents involving batteries and

5    weapons, including a battery on an inmate on November 14, 2002. Doc. 84-9 at 8.

6         Finally, Plaintiff alleges that on December 12, 2002, Southern Hispanic and Bulldogs riot

7    and he is silent as to the consequences of their actions, again to imply that only Blacks are

8    punished for wrongdoing. Doc. 84-10 at 4.  However, the documentation shows that both the

9    Southern Hispanics and the Bulldogs were placed on lockdown for this incident.  Id.

10        Plaintiff relies on Jefferson v. Southworth, 447 F. Supp., 179, 187 (D.R.I. 1978) for the

11   proposition that prison officials cannot be permitted to continue to inflict unconstitutional

12   hardships on inmates because of their lack of management capabilities.  However, Plaintiff's

13   reliance on this case is misplaced.  In Jefferson, the court found that prison officials were either

14   unable or unwilling to deal with extreme conditions which the court had previously found to be

15   cruel and unusual punishment in another case, Palmigiano v. Garrahy, 443 F. Supp. 956 (D.R.I.

16   1977) aff'd, 616 F. 2d 598 (1st Cir. 1980). The Director of the Corrections in Jefferson imposed

17   the lockdown within a few weeks of the district court's decision in Palmigiano and apparently in

18   response to it.  The district court found no emergency necessitating the lockdown and the

19   Director had announced his intention to continue the lockdown indefinitely.

20        In the instant case, prison officials were dealing with a legitimate and serious emergency.

21   Neither the extreme conditions, nor the apparent bad faith of prison authorities in Jefferson are

22   present in this case.   Accordingly, there is sufficient information to determine that the

23   Defendants were not deliberately indifferent to Plaintiff's  exercise needs when prison officials

24   provided limited access to the yard beginning August 1, 2002 through April 1, 2003.

25        Plaintiff also alleges that at all times alleged in the complaint, Defendants had buildings

26   fully equipped with their own recreation yard available for their use. Doc. 108 at 49-50; Doc. 94

27   at pg. 34; Doc. 95 at pg. 43-47 (Plaintiff exhibits 43-49).   Each yard was designed with safety

28   features which would have enabled the Defendants to safely provide inmates out of cell exercise,

1    including those inmates associated with disruptive groups or prison groups. Id. However, the

2    only evidence Plaintiff presents to support this contention is Plaintiff's request for admissions in

3    which Defendants denied these allegations. Thus, this does not support his contention.

4    Moreover, Defendants indicated that the yards are areas that could be converted to exercise yards

5    if the housing unit is ever converted to segregated housing which was not the case at the time of

6    this incident. Finally, Plaintiff alleges that no additional staff would be necessary to operate the

7    fully equipped yard and no conversion of the yard would have been required. However,

8    Defendants dispute this contention. Although Plaintiff alleges that he has spent over twenty

9    years in penological institutions, he is not a prison administrator, nor has he established that he is

10   an expert in the field of corrections. Therefore, he is not qualified to give a reliable opinion

11   regarding the viability of his proposal. In the absence of other admissible evidence, the court

12   rejects this argument.

13          *C.*      *January 9, 2002 through July 31, 2002*

14          Notwithstanding all of the above, Defendants point to no specific facts concerning what

15   was done in this particular investigation from January 9, 2002 to July 31, 2002 to demonstrate

16   that the restriction to the yard had a penological purpose that would warrant a deprivation of

17   exercise for nearly seven months. Defendants submitted a declaration from R. Comfort, the

18   former Facility Captain at the facility, which outlines the general steps that are taken to release a

19   lockdown and the related investigations. However, there is very limited information provided

20   regarding the specific investigation of the January 9, 2002 incident. Doc. 84-13. For example,

21   Officer Comfort generally outlines actions that are taken during an investigation to release a

22   lockdown. Id. at pg. 2-4. He states, "All efforts described above were undertaken to move

23   toward full release of the lockdown." Id at pg. 4 ¶ 18. He also indicates that his staff continued

24   to investigate the incident and that "it was eventually determined that the assault on staff was not

25   a pre-planned attack." Id at 5 ¶ 21. Finally, he states, "After it was determined that the assault

26   on the staff was not pre-planned, additional steps could be taken to gradually restore normal

27   programing." Id. at 6 ¶ 23. However, it is not clear on what day the investigation concluded, or

28   why this particular investigation took several months to complete.

1    Defendants also provide a declaration from V. Adams, Correctional Counselor II at

2  SATF.  Doc. 84-7.  In his declaration, Officer Adams lays the foundation for the Program Status

3  Reports which outlined the plan of operations for the facility during the lockdown. Id. His

4  declaration reiterates when various groups were denied and/or given access to program activities.

5  Id.; Doc. 84-8; Doc. 84-9; Doc. 84-10.  However, neither the declaration, nor any of the various

6  attached reports, discuss the investigation, or how the investigation affected decisions that were

7  made regarding inmates access to the exercise yard.  The court notes that the Program Status

8  Report dated March 26, 2003, indicates that the facility staff had completed a search of the

9  facility and a threat assessment.  It was determined that no credible threat toward staff existed.

10  However,  it is unclear if this is a reference to the investigation of the riot, or if this finding

11  relates to investigations of other incidents of violence that had been occurring in the prison at that

12  time.  Doc. 84-10 at pg. 12.

13    The only evidence Defendants submit regarding the actual investigation is a report dated

14  January 30, 2002, which indicates that some of the investigation had been completed by that

15  time.  Doc. 84-11.  Indeed, Defendants had completed enough of the investigation by January 30,

16  2002, that they felt some privileges should be reinstated a relatively short period of time after the

17  January 9, 2002 incident.  For example, on February 13, 2002, inmates were allowed to go to the

18  Canteen.  Similarly, on April 11, 2002, African Americans were allowed to have visiting hours.

19  However, there is no explanation of why these privileges were restored in the order that they

20  were given, or why officials felt that allowing prisoners access to the exercise yard would pose a

21  danger to the safety of the institution for the seven month period from January 9, 2002 to August

22  1, 2002.

23    Defendants argue that Plaintiff has not submitted any evidence to demonstrate that the

24  length of the investigation was unreasonable.  The court recognizes that prison officials should be

25  accorded leeway when examining issues related to institutional security especially when

26  responding to acts of violence.  Hoptowit v. Ray, 682 F. 2d at 1259; Hayward v. Procunier, 629

27  F. 2d. at 603; Whitley v. Albers, 475 U.S. 312, 322 (1986).   Notwithstanding this premise, this

28  leeway is not unfettered. Caldwell v. Miller, 790 F. 2d 589, 596 (7th Cir. 1986) (Prison officials

are accorded "wide-ranging deference in adopting policies that are needed to preserve internal order and security. However, it is not appropriate for courts to "defer completely to prison administrators.") Id. As Plaintiff noted, this is a case where prison officials formulated and developed a policy over time, with ample opportunity for reflection.  The deprivation was serious and it was for an extended period of time.  Plaintiff allegedly suffered physical and emotional symptoms during the time in question.  It is unclear to the court what the decision making process was during this time period, and why the investigation took as long as it did.

As stated above, the moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It is Defendants burden to bring forth enough evidence to support their motion.

Defendants argue that they were not subjectively deliberately indifferent to Plaintiff's right and need for exercise.  However, there is no declaration from either Defendant regarding the sequence of events in this particular case, what their role was in the decision making process regarding the lockdown, or why they made the particular decisions regarding inmates' access to exercise when they did.  In sum, Defendants have failed to provide the court with enough information regarding the aspects of this particular investigation to determine whether Defendants acted reasonably in denying yard access from January 9, 2002 until August 1, 2002. Specifically, the court is unable to ascertain whether Defendants' actions were driven by a penological purpose, and whether the restriction and its duration bore a relationship to legitimate attempts to ease the emergency.

### 6.   *Defendant Cuevas*

Defendant Cuevas argues he should be granted summary judgment because it is the Warden who is responsible for determining whether to declare a state of emergency and impose a lockdown.  The Civil Rights Act under which this action was filed provides:

> Every person who, under color of [state law] . . . subjects, or causes

> to be subjected, any citizen of the United States . . . to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution . . . shall be liable to the party injured in an action at
> law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute plainly requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v.  Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  The Ninth Circuit has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Defendants argue that because the Warden ultimately makes the decision when to release the lockdown, Cuevas' actions did not cause the alleged violation of Plaintiff's rights.  However, according to Defendants' undisputed facts, when the investigation is completed it is the responsibility of the Captain to develop a plan for releasing inmates from lockdown status. UF ¶ 18.  Since it is not clear when the investigation was completed, it is difficult for the court to discern what Cuevas' role was in the decision making process.  Defendants' evidence shows that Cuevas signed several of the Program Status Reports even when the lockdown was in place for various groups.  Doc. 84-8 at pgs. 10-18; Doc. 84-9 at pgs. 1-9; 12-20  Moreover, it is undisputed Cuevas met with African Americans in June to discuss their release into the day room. UDF ¶ 34; Doc. 84-12.  The purpose of the meeting was to notify the inmates about the proposals for modifying the lockdown in C-Facility. Id.

Therefore, viewing the evidence in favor of the nonmoving party, although Cuevas may not have ultimately decided when the lockdown should be lifted, it appears that he was involved in preparing the plans for releasing the lockdown.  He was also directly involved in the process of modifying the program status for certain groups.   As such, the court rejects Defendants' argument that he did not participate in acts that led to Plaintiff's alleged deprivation.

///

1          **7.    *Qualified Immunity***

2          Government officials enjoy qualified immunity from civil damages unless their conduct

3    violates "clearly established statutory or constitutional rights of which a reasonable person would

4    have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In ruling upon the issue of

5    qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party

6    asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right.

7    Saucier v. Katz, 533 U.S. 194, 201 (2001).  If, and only if, a violation can be made out, the next

8    step is to ask whether the right was clearly established. Id.  The inquiry "must be undertaken in

9    light of the specific context of the case, not as a broad general proposition . . . ." Saucier v. Katz,

10   533 U.S. 194, 201 (2002).  "[T]he right the official is alleged to have violated must have been

11   'clearly established' in a more particularized, and hence more relevant, sense:  The contours of

12   the right must be sufficiently clear that a reasonable official would understand that what he is

13   doing violates that right." Saucier, 533 U.S. at 202 (citation omitted).

14         Since the court will grant Defendants re-newed motion for summary judgment with

15   regard to the exercise claims for the period of time beginning August 1, 2002 until April 1, 2003,

16   qualified immunity will not be addressed for that time period.  The question becomes whether the

17   Defendants are entitled to qualified immunity for the deprivation of exercise from January 9,

18   2002 until July 31, 2002.

19         Defendants argue that they are entitled to qualified immunity because although the law

20   was clearly established that some form of exercise is important to maintaining the physical and

21   mental health of prisoners at the time of the lockdown, the law is also clearly established that

22   outdoor exercise may be restricted when disciplinary needs, or other unusual circumstances,

23   make exercise impossible. Thus, Plaintiff cannot show that the lockdown was not appropriate

24   given the emergency.  Defendants also argue that even if the court concludes that a reasonable

25   prison official should have know that a lockdown could not be imposed for seven months, and

26   gradually lifted over the following eight months, officials are entitled to qualified immunity on

27   the grounds that they reasonably could have believed that their actions were appropriate.

28         In resolving the issue of qualified immunity, the court must view the evidence in the light

1  most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  Martinez
2  v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).  Plaintiff has presented evidence that he was
3  not given any exercise from January 9, 2002, until August 2002.  Thereafter, he was only allowed
4  sixteen two hours periods of exercise until April 2003.  The court agrees with Plaintiff that it was
5  clearly established at the time of the lockdown that deprivation of exercise for an extended period
6  violates the Eighth Amendment.  The question becomes whether the right was clearly established
7  given the emergency prison officials were faced with.  However, because Defendants have not
8  provided enough information regarding the investigation into the January 9th riots as outlined in
9  the preceding section, and because the deprivation of exercise was for such an extended period of
10 time, the court cannot determine the reasonableness of their actions.  Accordingly, Defendants
11 are not entitled to qualified immunity based on the evidence submitted.

12 **E. CONCLUSION**

13      Accordingly, the Court ORDERS that:

14      1.      The motion for summary judgment is GRANTED regarding Plaintiff's
15              Eighth Amendment access to exercise claims against Defendants Cuevas
16              and Adams for the period between August 1, 2002, until April 1, 2003;

17      2.      The motion for summary judgment is DENIED without prejudice
18              regarding Plaintiff's Eighth Amendment access to exercise claims against
19              Defendants Cuevas and Adams for the period between January 9, 2002,
20              and July 31, 2002;

21      3.      Defendants may file a third Motion for Summary Judgment addressing the
22              remaining issues outlined in this order within thirty (30) days of this
23              order's date of service; and

24      4.      If no other motion for summary judgment is filed within the prescribed
25              time, the court will set the case for trial.

26 IT IS SO ORDERED.

27 **Dated:     March 31, 2008**                    **/s/ Anthony W. Ishii**
                                         UNITED STATES DISTRICT JUDGE
28