# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN JOSEPH NOBLE, IV,<br><br>        Plaintiff,<br><br>    v.<br><br>D. ADAMS, et. al.,<br><br>        Defendants. | 03-cv-5407 AWI SMS PC<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING DEFENDANTS' MOTION IN PART<br><br>(Doc. 120) |

## I.  Introduction

Steven Joseph Noble ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This case is proceeding on an Amended Complaint that was filed on May 12, 2003.  In the Amended Complaint, Plaintiff alleged *inter alia*, that his Eighth Amendment rights were violated at the California Substance Abuse Treatment Center in Corcoran, California, because he was deprived of outdoor exercise for several months during a lockdown.  Pending before the court is Defendants' third Motion for Summary Judgment filed on July 8, 2008.  Plaintiff filed his opposition on October 28, 2008. Defendants did not file a reply.  Upon reviewing the evidence and filings in this case, the court GRANTS Defendant's motion IN PART and DENIES Defendants' motion IN PART.

## II.  Procedural History

In the Amended Complaint, Plaintiff alleges that his constitutional rights were violated because he was denied access to the courts, that prison officials unlawfully interfered with his

1

mail, and that Defendant Cuevas and Adams ("Defendants") violated his Eighth Amendment rights by limiting his access to outdoor exercise from January 9, 2002 to April 2003. Specifically, Plaintiff alleges that he was denied access to outdoor exercise from January 9, 2002 through August 13, 2002, and was only granted 16 two hour yard periods between August 13, 2002 and April 2003.

On December 7, 2006, Defendants filed a Motion for Summary Judgment.[1] Plaintiff filed his opposition to the Motion on February 27, 2007. On March 26, 2007, the court issued Findings and Recommendations that Defendant's motion be granted on Plaintiff's denial of access to the courts and mail interference claims. However, the court found that with regard to Plaintiff's Eighth Amendment claim, that Defendant Adams and Cuevas failed to refute the allegations in the complaint. Specifically, that Defendants failed to provide any specific facts concerning the times Plaintiff was allotted time out of his cell and for how long during each period in question. After reviewing the objections, this court adopted the Findings and Recommendations on May 18, 2007. The court gave Defendants an opportunity to file a second Motion for Summary Judgment.

Defendants Cuevas and Adams filed their a second Motion for Summary Judgment on June 21, 2007. Plaintiff filed his opposition on July 27, 2007. Defendants filed their reply on August 6, 2007. On March 31, 2008, the court granted Defendants' Motion for Summary Judgment in part. Specifically, the court granted summary judgment in favor of Defendants regarding Plaintiff's Eighth Amendment access to exercise claims for the period between August 1, 2002, until April 1, 2003. However, the court denied Defendants Cuevas and Adams' Motion for Summary Judgment without prejudice regarding Plaintiff's Eighth Amendment access to exercise claims for the period between January 9, 2002, and July 31, 2002.[2] The court gave Defendants the opportunity this file this third Motion for Summary Judgment.

---

[1] On December 3, 2004, prior to filing the motion for summary judgment, Defendants also moved to dismiss the action on the grounds that Plaintiff failed to exhaust his administrative remedies. An amended motion was submitted on December 21, 2004. The Court issued Findings and Recommendations that the Motion be denied on August 19, 2005. The District Court adopted the Findings and Recommendations on September 21, 2005.

[2] Defendants Cuevas and Adams are the only remaining defendants in this case.

2

### III. Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a Summary Judgment Motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e.,

the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (*quoting* Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the Motion for Summary Judgment, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (*citing* United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(*per curiam*). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (*citation omitted*).

## IV. Undisputed Facts[3]

1. On January 9, 2002, there was a fight involving nine white inmates on the southeast side of the C-Facility exercise yard, near the gym at the California

---

[3] The following facts are undisputed for the purpose of the instant motion and do not apply to any subsequently filed motion. The court previously determined that there were forty-seven (47) other undisputed facts in the March 31, 2008 order. Doc. 114.

4

Substance Abuse Treatment Facility in Corcoran, California ("SATF"). One inmate was seriously injured with cuts to his neck and face. Declaration of R. Comfort, dated June 2, 2008, ("Comfort Decl.") at ¶ 3.

2. Whenever an incident occurs on the exercise yard, the crime scene must be secured, which involves searching and returning inmates to the respective housing units. On January 9, 2002, the inmates who were not involved in the incident were given unclothed body searches before they were allowed to enter their housing units. Id.

3. Approximately ninety minutes after the initial incident, while inmates were waiting to be processed into their housing unit, there was a physical altercation between staff and inmates which involved attempted murder on a correctional officer.[4] Id. at ¶ 4.

4. Ultimately, staff controlled the attack on staff through the use of overwhelming physical force. During the riot, an officer used a 37 mm gun, fourteen officers used pepper spray, two officers used their side-handle batons, and eleven officers used physical force. Id. at ¶ 5.

5. Declarant R. Comfort's correctional career exceeds twenty years. In that time, he has witnessed, or been involved with numerous incidents of violence, including attacks by inmates on other inmates and attacks by inmates on staff. He was present, and personally observed the inmate attack on staff on January 9, 2002. The incident was the most violent, savage assault he has ever witnessed. Declarant Comfort believes that for many staff at SATF this attack was a life-changing event. Similarly, Plaintiff believes that this was a life changing event for himself and the inmates. Id.

6. After the assault was controlled, numerous inmate manufactured weapons were

---

[4] Plaintiff has objected to the characterization by Defendants that his incident involved several inmates gaining control of batons and using them to violently beat several officers. Accordingly, this fact has been altered as the nature and extent of the altercation is disputed.

5

found in the area of the attack. Id. at 6. [5]

7. After the lockdown was imposed, the first priority was the gathering of information and the completion of the incident report. The report of the January 9, 2002, incident was not completed until January 30, 2002, because of the seriousness of the incident, the number of staff injured, the number of inmates involved, and the number of weapons recovered. Id. at ¶ 7.

8. Following a major incident such as the January 9, 2002 attack on staff, a lockdown serves a number of purposes. Because both staff and inmates have strong emotional responses to a major incident, the initial phase of a lockdown acts as a "cooling-off" period. With the passage of time, the emotions subside and inmates will become more cooperative, will be more willing to provide information to staff, and more willing to cooperate in resolving whatever conflict exists, whether it is between inmate groups or between inmates and staff. Id. at ¶ 8.

9. The initial phase of the lockdown of C-Facility also included a thorough search of the entire facility. There are eight housing units, and a thorough search includes searching all inmates, the contents of every cell, all inmate property, and all common areas of the housing unit. A search of a housing unit has to be completed in one day to prevent inmates from moving contraband to an area of the housing unit that has already been searched. Id. at ¶ 9.

10. The primary goal of any lockdown, including the one imposed on January 9, 2002, is to determine when it is safe to release the inmates to normal programming. This is not a determination that is easily made, and the consequences for making a mistake can be the resumption of violence, with injuries to inmates and staff. As the Facility Captain, it was R. Comfort's responsibility to provide

---

[5] Plaintiff disputes this fact and several other facts on the basis that he does not believe that certain facts justify Defendants' actions including the lockdown and the deprivation of exercise. However, these opinions do not render a fact disputed.

recommendations to his superior staff concerning the risks posed by releasing inmates from the January 9, 2002, lockdown, Id. at ¶ 10.

11. The inmates housed in C-Facility had unique characteristics which influenced the decisions regarding the lockdown. Id. at 11.

12. The Department of Corrections and Rehabilitation has an objective point scoring system used to determine the level of custody assigned to an inmate. Level IV is the highest level that can be assigned to a general population inmate. The length of an inmate's prison commitment can be a major component of a high classification score, meaning that many inmates who are disciplinary free who have a high point score are classified as Level IV. Id.

13. The Department has two different housing unit designs for Level IV housing. The housing unit in C-Facility is what is called a 180 degree design. The other Level IV design is called a 270 degree design. The 180 degree type of construction provides a high level of observation, and therefore, control over a housing unit. The majority of inmates confined in 180 degree design housing are there because they have demonstrated through their institutional behavior that they need higher levels of custodial supervision than other Level IV inmates. Id.

14. Many of the inmates housed on C-Facility at the time of the January 9, 2002, assault on staff, had been released from a security housing unit, had a history of in-prison violence, or were gang affiliated. Most of the African American inmates in C-Facility were affiliated with street gangs such as the CRIPS or the Bloods. Therefore, the potential for violence, if the lockdown was released prematurely, is much greater than if C-Facility had been a Level III facility, or even a 270 degree level IV Facility. Id. at ¶ 12.

15. The ultimate conclusion for the January 9, 2002, attack on staff, more reasonably characterized as staff's "best guess" of the reason, was that inmate Moreno, H-28772, seized an opportunity to assault an officer he had a personal grudge against. Inmate Moreno incited other inmates into joining in his assault on staff.

|   |     | To this day, Declarant Comfort does not believe that anyone is absolutely convinced that this explanation is the actual truth, but it is accepted as the most likely cause of the attack.[6] Id. at ¶ 13. |
|---|-----|---|
|   | 16. | The incident contained many elements which contradicted the "one inmate with a grudge" explanation. For example, Inmate Moreno was not known as a leader of the CRIPS affiliated inmates yet he was able to command a large number of other inmates to spontaneously assault staff. Id. at ¶ 14. |
|   | 17. | Most riots are planned events, which seems consistent with the large number of weapons being found after the incident. However, inmate weapons were not used on staff, which seemed consistent with information that an attack on staff was not preplanned. Id. |
|   | 18. | The investigation of a major incident, including this one, is a long process, complicated by many factors. Initially, inmates will not talk to staff, because of anger, and hostility generated by the incident itself. This is especially true of the kind of inmates confined in C-Facility that have a history of anti-social behavior. The gang culture also forces its members and associates to refuse to deal with staff. Id. at ¶ 15. |
|   | 19. | After the initial hostility and anger subsided the inmates were still unwilling to provide information. Inmates have television sets, radios, or CD players for entertainment. Ultimately, however, boredom set in and inmates were willing to |

---

[6] Plaintiff contends that this fact and fact number 16 are not true. He alleges that staff orchestrated the assault on staff and maintained a state of emergency until June 15, 2002. He also alleges that other inmates went to the aid of Moreno only after several prison guards converged upon him and began beating him. These facts in dispute are not material because the ultimate cause of the lockdown is not relevant to a determination of the reasons why inmates were not provided with exercise. The Ninth Circuit has determined that whether the state of affairs at the prison leading up to the lockdown was the fault of the prison officials is irrelevant for the purpose of evaluating conditions during the lockdown. Hoptowit v. Ray, 682 F. 2d 1237, 1259 (9th Cir. 1982). "The prison officials have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost. This is for the benefit of the prisoners as much as for the benefit of the prison officials." Id. Defendants unquestionably have a need to preserve the safety and security of the institution, which includes protecting staff and inmates. Bell v. Wolfish, 441 U.S. 520, 546-47 (1979). This fact will remain undisputed for purposes of this motion.

| | | |
|---|---|---|
| 1 | | provide information in order to have normal programming reinstated.[7] Id. at ¶ 16. |
| 2 | 20. | Information provided by inmates has to be checked and verified and confirmed by |
| 3 | | other sources before it can be considered trustworthy. Many inmates who are |
| 4 | | willing to talk to staff often provide deliberately false information, or third-hand |
| 5 | | information, or information that is not fact, but the inmate's own conjecture. It |
| 6 | | takes time to receive sufficient corroborating information to be sure that a release |
| 7 | | from a lockdown will not result in further violence. Id. |
| 8 | 21. | Another threat that had to be investigated and resolved was the possibility of |
| 9 | | violence between the Southern Hispanic and African-American inmates. On |
| 10 | | January 9, 2002, a large number of inmate manufactured weapons were recovered. |
| 11 | | Even if the African-American inmates had not planned to attack staff, there was a |
| 12 | | high risk of future violence if they had been planning to attack other inmates. Id. |
| 13 | | at ¶ 17. |
| 14 | 22. | Prior to the January 9, 2002 incident, there were rumors circulating in C-Facility |
| 15 | | that the Southern Hispanic inmates were planning to assault the CRIP affiliated |
| 16 | | inmates, which would explain why the CRIPs had weapons on January 9, 2002. |
| 17 | | Id. |
| 18 | 23. | Prison records reveal that the decision was made to release the lockdown |
| 19 | | gradually. The first step, instituted on April 11, 2002, was to permit African |
| 20 | | American and White inmates to have contact visits. Id. at ¶ 18. This meant that |
| 21 | | all inmates at C-Facility would mingle in the visiting room and staff would be |
| 22 | | able to monitor their interactions. After it was determined that the visiting |
| 23 | | program was successful, a modified day room access program was instituted on |
| 24 | | June 13, 2002. Id. On June 25, 2002, non-gang affiliate African American |

---

[7] This fact has been modified as Plaintiff alleges that all inmates were not content to sit in their cells and that several inmates were interviewed by staff. However, members of the Inmate Advisory Council representing the black population were not interviewed until June 27, 2002. Since Defendants do not state a specific date that all interviews were completed, any of the reference to the dates inmates were interviewed alleged by Plaintiff will not be addressed. See, Plaintiff's Statement of Disputed Facts. Doc.127, pg. 9 ¶ 71.

9

1  inmates were added to the day room. Id. Finally, on August 1, 2002, a modified
2  program for outdoor exercise was implemented for all inmates in C-Facility.[8] Id.
3  24.   In addition to the threat posed by releasing African-American inmates from
4        lockdown status, staff in C-Facility were also dealing with other inmate conflicts.
5        Institutional records show that within one week of implementing the modified
6        outdoor exercise program, "Bulldog" affiliated inmates and Southern Hispanic
7        inmates were returned to lockdown status, and as of September 13, 2002, white
8        inmates were also returned to lockdown status. Id. at ¶ 19.

## V. Analysis

### A. Summary of the Remaining Claim in Plaintiff's Complaint

In its previous March 31, 2008 order, the court found that Defendants Adams and Cuevas were not deliberately indifferent when they locked down the prison on January 9, 2002. Doc. 114, pg. 14:19-13. The only remaining issue is whether Defendants were deliberately indifferent when Plaintiff was not given an opportunity to exercise after the lockdown commenced until August 1, 2002, when a modified exercise program was instituted.

### B. The Eighth Amendment - Generally

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain . . . ." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety. Id.; Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986); Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982). Where a prisoner alleges injuries stemming from unsafe conditions of confinement, prison officials may be held liable only if they acted with "deliberate indifference to a substantial risk of serious harm." Frost v. Agnos, 152 F.3d 1124,

---

[8] In an attempt to dispute this fact, Plaintiff argues that each yard in a 180 degree design Level VI yard is equipt with safety features which enables staff safely provide inmates with out-of-cell exercise in "controlled groups" without requiring additional staff. He has provided declarations from several of the inmates at this facility alleging the same contention. However, as noted in this court's prior order, Plaintiff or the other inmates are not experts in correctional security, nor are they qualified to render an opinion regarding the amount of staff needed to adequately supervise inmates. Accordingly, this fact will remain undisputed.

1128 (9th Cir. 1998).

The deliberate indifference standard involves an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious . . . ." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Second, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." Farmer, 511 U.S. at 837. Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it. Id. at 837-45. Prison officials may avoid liability by presenting evidence that they lacked knowledge of the risk, or by presenting evidence of a reasonable, albeit unsuccessful, response to the risk. Id. at 844-45. A prison official's duty under the Eighth Amendment is to ensure "'reasonable safety,'" a standard that incorporates due regard for prison officials unenviable task of keeping dangerous men in safe custody under humane conditions. Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause. Id.

### C. *The Eighth Amendment and the Right to Exercise During a Lockdown*

"[The] deprivation of outdoor exercise [can] constitute cruel and unusual punishment." Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1995). While the temporary denial of outdoor exercise with no medical effects is not a substantial deprivation, May v. Baldwin, 109 F.3d 557, 565 (9th Cir. 1997), in the Ninth Circuit, the deprivation of regular outdoor exercise for a prolonged period, is unquestionably sufficient to meet the objective requirement of the Eighth Amendment analysis. Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (denial of all outdoor exercise for six weeks meets objective Eighth Amendment requirement); Allen, 48 F.3d at 1086-88 (forty-five minutes of outdoor exercise per week for six weeks meets objective Eighth Amendment requirement).

In their second Motion for Summary Judgment, Defendants conceded that the deprivation for seven months and the limited access to exercise for the succeeding eight months is sufficiently serious to constitute an objective risk to Plaintiff's health. Doc. 105, pg. 8 : 6-10.

Defendants now argue that the objective component is not met because prison officials were responding to a genuine emergency and fundamental services can be suspended. Furthermore, they argue there is no case which establishes a set period of time that outdoor exercise can be withheld when prison officials are attempting to resolve violent conflicts and releasing from a lockdown.

The court is not persuaded by Defendants' new arguments. As noted in this court's previous order, courts must give reasonable leeway to the decisions prison officials make when there is a lockdown. Hoptowit v. Ray, 682 F. 2d at 1237, 1259 (9th Cir. 1982); Whitley v. Albers, 475 U.S. 310, 321-22 (1986). However, prison officials must also meet Eighth Amendment standards in providing basic human needs to prisoners. Hoptowit v. Ray, 682 F. 2d at 1259. "When a genuine emergency exists, prison officials may be more restrictive than they can otherwise be." Id. However, "[t]he more basic the particular need, the shorter the time it can be withheld." Id. There is substantial agreement that some form of regular outdoor exercise is extremely important to the psychological and physical well-being of the inmates. Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979). Regular outdoor exercise is necessary "unless inclement weather, unusual circumstances, or disciplinary needs ma[k]e that impossible. Id.

While the courts have not defined a set period of time that outdoor exercise can be withheld during a lockdown situation, the cases in this area suggests that deprivation of outdoor exercise for a seven month period meets the objective component of an Eighth Amendment violation. In Spain v. Procunier, the court found that prisoners' Eighth Amendment rights had been violated when there was no lockdown, but prisoners were confined to continuous segregation virtually 24 hours a day for four years. During this time, prisoners were given very limited, and in some cases, no exercise. Spain v. Procunier, 6000 F. 2d at 199. The court recommended that prisoners in these conditions should receive one hour of exercise a day, five days a week. Id.

In Hayward v. Procunier, 629 F. 2d. 599, 603 (9th Cir. 1980), the Ninth Circuit examined prisoners' access to exercise during a lockdown. The court determined that deprivation to outdoor exercise and a five-month lockdown in response to a genuine emergency did not violate

the Eighth Amendment. However, in Hayward, plaintiffs "were allowed approximately the minimum exercise mandated in Spain within a month after the imposition of the lockdown." Id.

As noted in the court's previous order, the circumstances of the instant case falls between the parameters of the Spain and Hayward decisions. In Hoptowit v. Ray, one of the cases upon which Defendants rely, the Ninth Circuit held that when examining conditions of confinement during a lockdown situation, the court should "consider whether each specific restriction imposed amounted to an infliction of pain without penological purpose." Hoptowit v. Ray, 682 F. 2d at 1259. In making this evaluation, "the district judge should consider the length of time of each restriction was in effect, and whether the restriction and its duration bore a relationship to legitimate attempts to ease the emergency." Id.

In this case, the court finds that the deprivation of exercise for the seven month period is sufficiently serious to meet the objective component of an Eighth Amendment violation. The issue remaining is whether Defendants were deliberately indifferent to Plaintiff's needs during this time period. This is especially true given the limited information Defendants have provided regarding whether the restriction in exercise bore an attempt to ease the emergency, and whether the restriction had a penological purpose.

In its previous order, the court noted that Defendants had not provided "specific facts concerning what was done in the investigation from January 9, 2002 to July 31, 2002, to demonstrate that the restriction to the exercise yard had a penological purpose that would warrant a deprivation of exercise for nearly seven months." Doc. 114, pg. 18:14-17. For example, it was not clear on what day the investigation was concluded, or why this particular investigation took several months to complete. Doc. 114, pg. 18:27-28. Furthermore, there was no explanation of why privileges were restored in the order that they were given, or why officials felt that allowing prisoners access to the exercise yard would pose a danger to the safety of the institution for the seven month period from January 9, 2002 to August 1, 2002. Doc. 114, pg. 19: 19-22. Finally, the court indicated that there was "no declaration from either Defendant regarding the sequence of events in this particular case, what their role was in the decision making process regarding the lockdown, or why they made the particular decision regarding inmates' access to exercise when

they did." Doc. 114, pg. 20 :15-18.

Despite the court's instructions, the instant motion is not supported by declarations from either defendant. Defendants however did provide a second declaration from R. Comfort, Facility Captain during the lockdown.[9] Comfort Decl. at ¶ 7- 12. In this declaration, Captain Comfort explains the purpose and the general processes that occur during a lockdown. However, the declaration raises more questions than it answers. For example, the declaration indicates that an incident report was completed on January 30, 2002, suggesting that the investigation of the January 9, 2002, incident was completed on January 30, 2002. Comfort Decl. at ¶ 7. Based on this information, Defendants have submitted enough evidence to establish that the deprivation of exercise from January 9, 2002 until January 30, 2002, had a penological purpose because it took at least this long for prison officials to complete the investigation. However, beyond January 30, 2002, Defendants' evidence is lacking as it is not clear whether the entire investigation was completed by January 30, 2002, or if there was an ongoing investigation or other factors which necessitated the continued lockdown.

Moreover, although the declaration indicates that the investigation was completed by January 30, 2002, the declarant states that he does "not now recall the specific time lines for releasing from the January 9, 2002 lockdown." Comfort Decl. at¶ 18. Captain Comfort states that prison records indicate that the lockdown was released gradually. The first step, instituted on April 11, 2002, was to permit African American and White inmates to have contact visits. Id. This meant that all inmates at C-Facility would mingle in the visiting room and staff would be able to monitor their interactions. After it was determined that the visiting program was successful, a modified day room access program was instituted on June 13, 2002. Id. On June 25, 2002, non-gang affiliated African American inmates were added to the day room. Id. Finally, on August 1, 2002, a modified program for outdoor exercise was implemented for all inmates in C-Facility. Id.

While this is informative, the court had much of this information at the time of its

---

[9] R. Comfort provided a declaration in Defendant's second Motion for Summary Judgment.

previous ruling. The crux of Defendants' argument in the instant motion is that given all of these circumstances, Defendants used their best judgment to implement an incremental release from the lockdown. They contend that because there was a high degree of hostility by African American inmates toward staff in the C-facility, and most of the inmates were gang affiliated with in-prison histories of violence, a more gradual release of the lockdown was necessary.

While this may be the case, Defendants have not provided this court with enough specific information to establish that a deprivation of exercise from January 31, 2002 through July 31, 2002 had a legitimate penological purpose when the investigation of the riot which was one of the bases of the lockdown appears to have been completed by January 30, 2002. Moreover, the declaration indicates that it was prison officials "best guess" that the reason for the attack was that an inmate was acting on a personal grudge against a prison official and incited other inmates to join in. Id. at ¶ 13. It appears that prison officials did not believe that this was a pre-organized attack on staff.

The court is cognizant of the fact that notwithstanding the above, there are security concerns that must be addressed especially given the serious nature of the January 9, 2002 incident and the violent histories of some of the inmates in Facility C. However, since neither defendant has provided a declaration, the court cannot determine what their roles were in the decision making process of the lockdown, and what information they had available to them at the time of their decisions. Therefore, the court has no way to determine what, if any, decisions either Defendant made, whether the Defendants believed that their decisions had a penological purpose, or what the penological purpose was at any given time. Moreover, it is still unclear whether the Defendants considered allowing inmates access to the exercise yard, or whether other exercise alternatives were considered. If they were considered, why weren't they implemented ?

Prison officials should be accorded leeway when examining issues related to institutional security, however, the court must also employ the standards outlined in Hoptowit v. Ray, 682 F. 2d at 1259. The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It is Defendants' burden to bring forth enough evidence to support their motion. In short, Defendants again have failed to provide the court with enough information regarding the aspects of the lockdown as it relates to the restriction of inmates' access to exercise. Accordingly, the court is unable to determine whether their actions supported a penological purpose, and whether the restriction and its duration bore a relationship to legitimate attempts to ease the emergency from January 31, 2002, through July 31, 2002.

### E. Qualified Immunity

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). Qualified immunity analysis entails a two-step inquiry. See, e.g., Saucier v. Katz, 533 U.S. at 201-205 (2001); but see Pearson v. Callahan, 129 S. Ct. 808 (2009) (holding that Saucier analysis should not be regarded as mandatory).[10]

The first step is to determine whether a constitutional violation exists. If, and only if, a violation can be made out, the next step is to ask whether the right was clearly established. Id. The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Saucier v. Katz, 533 U.S. 194, 201 (2002). "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202 (citation omitted).

---

[10] Under Pearson, the Court has discretion to avoid the first prong of the Saucier inquiry if it appears that the constitutional right at issue is not clearly established. Because Plaintiff's allegations set forth a violation of a clearly established constitutional right, the Court adheres to the Saucier framework in deciding Defendants' motion.

16

The question becomes whether the Defendants are entitled to qualified immunity for the deprivation of exercise from January 31, 2002 until July 31, 2002. Defendants argue that they are entitled to qualified immunity if a reasonable prison official could have believed their actions were appropriate. Additionally, Defendants are entitled to qualified immunity because Defendants reasonably believed that their own actions were lawful.

The law is clearly established that some form of exercise is important to maintaining the physical and mental health of prisoners. The law is also clearly established that outdoor exercise may be restricted when disciplinary needs, or other unusual circumstances, make exercise impossible. The question becomes whether the right to outdoor exercise was clearly established given the emergency prison officials were faced with. However, because Defendants have not provided enough information regarding the exact sequence of events of the lockdown, nor have Defendants submitted any declarations regarding their decisions to restrict inmates' access to the exercise yard, the court cannot determine the reasonableness of Defendants' beliefs, or their actions. Therefore, the court cannot find that Defendants are entitled to qualified immunity.

**VI. Conclusion**

Accordingly, the court orders that:

1) Defendants' Motion for Summary Judgment is GRANTED regarding Plaintiff's Eighth Amendment access to exercise claims against Defendants Cuevas and Adams for the period beginning January 9, 2002 through January 30, 2002; and

2) Defendants' Motion for Summary Judgment is DENIED regarding Plaintiff's Eighth Amendment access to exercise claims against Defendants Cuevas and Adams for the period beginning January 31, 2002 through July 31, 2002.

IT IS SO ORDERED.

**Dated:     March 25, 2009**           /s/ Anthony W. Ishii
                          CHIEF UNITED STATES DISTRICT JUDGE